UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------------- X

ROBERT L. COULTER, SR. FOR THE ESTATE
OF JANIS RUTH COULTER, DIANNE
COULTER MILLER, ROBERT L. COULTER, SR.
ROBERT L. COULTER, JR., DR. LARRY CARTER,
SHAUN COFFEL, DR. RICHARD BLUTSTEIN AND
DR. KATHERINE BAKER FOR THE ESTATE OF
BENJAMIN BLUTSTEIN, DR. RICHARD BLUTSTEIN,
DR. KATHERINE BAKER, REBEKAH BLUTSTEIN,
NORMAN: AND NEVENKA GRITZ FOR THE ESTATE
OF DAVID GRITZ, NORMAN GRITZ, NEVENKA
GRITZ, BENNET AND PAULA FINER AS LEGAL
GUARDIANS FOR CHANA NACHENBERG, DAVID
NACHENBERG, SARA NACHENBERG, BENNETT
FINER, PAULA FINER, ZEV FINER, SHOSHANA
FINER OHANA, MINA DORA GREEN, HOWARD M.
GREEN, STEVEN GREENBAUM FOR THE ESTATE
OF JUDITH GREENBAUM, STEVEN GREENBAUM,
ALAN HAYMAN, SHIRLEE HAYMAN, DAVID
DANZIG, REBECCA DANZIG, NEIL DANZIG,
HAYYIM DANZIG, SARAH DANZIG, YITZHAK
BEN-YISHAI AND MIRIAM I. BEN-YISHAI FOR THE
ESTATE OF SHOSHANA BEN-YISHAI, YITZHAK
BEN-YISHAI, MIRIAM I. BEN-YISHAI, JACOB
BEN-YISHAI, ISRAEL CHAI BEN-YISHAI, CHANA
BEN-YISHAI, YAEL BEN-YISHAI, ABIEL
BEN-YISHAI, SHABTAI SCOTT SHATSKY, JOANNE
CHAVA SHATSKY, TZIPPORA SHATSKY, YOSEF
SHATSKY, SARA SHATSKY TZIMMERMAN,
MIRIAM SHATSKY, DAVID SHATSKY, CHANA
FRIEDMAN, ILAN FRIEDMAN, MIRIAM FRIEDMAN,
YEHIEL FRIEDMAN, ZVI FRIEDMAN, BELLA
FRIEDMAN, GINETTE LANDO THALER FOR THE
ESTATE OF RACHEL THALER, GINETTE LANDO
THALER, MICHAEL THALER, LEOR THALER, ZVI
THALER, ISAAC THALER, HILLEL TRATTNER,
RONIT TRATTNER, ARON S. TRATTNER, SHELLEY
TRATTNER, STEVEN BRAUN, DANIEL
ROZENSTEIN, JULIA ROZENSTEIN SCHON,
NETANEL HERSKOVITZ, MARTIN HERSKOVITZ,
PEARL HERSKOVITZ, YAAKOV HERSKOVITZ,
TEMIMA SPETNER, ALTEA STEINHERZ,
JONATHAN STEINHERZ, DR. ALAN J. BAUER,
REVITAL BAUER, YEHONATON BAUER,

Case No.

CV 05    365

COMPLAINT

GERSHON, J.

CHREIN, J.

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT. E.D.N.Y.
★    JAN 2 1 2005    ★

BROOKLYN OFFICE

BINYAMIN B. BAUER, DANIEL Y. BAUER,            :
YEHUDA BAUER, JACOB STEINMETZ, DEBORAH         :
STEINMETZ, AMICHAI STEINMETZ, NAVA             :
STEINMETZ, ORIT STEINMETZ, NATANEL             :
STEINMETZ, HARRY LEONARD BEER AS               :
EXECUTOR OF THE ESTATE OF ALAN BEER,           :
HARRY LEONARD BEER, ANNA BEER, PHYLLIS         :
MAISEL, ESTELLE CARROLL, SARRI ANNE SINGER,:
JUDITH SINGER, ERIC M. SINGER, GALIT           :
LEIBOVITCH, SHLOMO LEIBOVITCH, HILA            :
LEIBOVITCH, MOSHE LEIBOVITCH, NATANIEL         :
LEIBOVITCH, SHIRA LEIBOVITCH, AVIGAIL LEWIS :
BITON AS THE ADMINISTRATOR OF THE ESTATE       :
OF GAVRIEL BITON, AVIGAIL LEWIS BITON,         :
ELYASHIV BITON, TAMAR BITON, NOAM BITON,       :
ORIYA BITON, SHILO BITON, ADI PENINA BITON,    :
RACHEL ASSRAF, ELI ASSRAF, MOSHE ASSRAF,       :
LESLYE KNOX, FOR THE ESTATE OF AHARON          :
BEN-YISRAEL ELLIS, LESLYE KNOX, JORDAN         :
TERRELL ELLIS, REUVEN CARTER, SHANON           :
CARTER, SHAYRAH CARTER, YOSHAVYAH              :
CARTER, AMITAI CARTER, PRINCE ELKANNANN        :
BEN SHALEAK, MELLO NEE ELLIS, SHEMARIA         :
ELLIS, FRANCINE ELLIS, LYNNE ELLIS,            :
YEHONADAV ELLIS, TSAPHRIRAH ELLIS, SHAYNA :
EILEEN GOULD, RONALD ALLAN GOULD, ELISE        :
JANET GOULD, JESSICA RINE, SHOSHANA ZELCER,:
SHMUEL WALDMAN, HENNA NOVACK WALDMAN,:
MORRIS WALDMAN, EVA WALDMAN, CHANIE           :
BODENSTEIN, SHAINDY WEINBERGER, PHILIP         :
WALDMAN, ABRAHAM WALDMAN, DASSIE              :
WALDMAN, OZ JOSEPH GUETTA, VARDA GUETTA,:
SARA GUETTA KLEITMAN, LEONARD                  :
MANDELKORN, NURIT MANDELKORN, EZRA             :
KESSLER, CHANA B. KESSLER, FORTOUNA            :
BRIGITTE KESSLER, SHALOM KESSLER, KLILA        :
KESSLER, MARK I. SOKOLOW, RENA M. SOKOLOW,:
JAMIE A. SOKOLOW, LAUREN M. SOKOLOW,           :
ELANA R. SOKOLOW, REUVEN GILMORE AND           :
SHEILA GILMORE AS ADMINISTRATORS OF THE        :
ESTATE OF ESH KODESH GILMORE, REUVEN           :
GILMORE, SHEILA GILMORE, INBAL GILMORE         :
RATZ,TALYA GILMORE, MALKITZEDEK GILMORE, :
TIFERET GILMORE, HEFTIZBAH GILMORE, ELIANA:
GILMORE, DROR GILMORE, KAREN GOLDBERG,         :
CHANA GOLDBERG, ESTHER GOLDBERG,               :

2

YITZHAK GOLDBERG, SHOSHANA GOLDBERG,          :
ELIEZER GOLDBERG, YAAKOV MOSHE                :
GOLDBERG, TZVI YEHOSHUA GOLDBERG, GRETA  :
GELER AS THE ADMINISTRATOR FOR THE ESTATE :
OF HANNAH ROGEN, JACQUELINE CHAMBERS AS  :
THE ADMINISTRATOR OF THE ESTATE OF ESTHER :
BABLAR, JACQUELINE CHAMBERS, LEVANA           :
COHEN HAROOCH, GILA ALUF, YIFAT ALUF, URI     :
ALUF, TAMAR ALUF, BARAK ALUF and RUTH         :
ALUF,                                         :
                          Plaintiffs,         :
          -against-                           :
                                              :
ARAB BANK, PLC,                               :
                          Defendant.          :
----------------------------------------------------------------------X

Robert L. Coulter, Sr. for the Estate of Janis Ruth Coulter, Dianne Coulter Miller, Robert L. Coulter, Sr. Robert L. Coulter, Jr., Dr. Larry Carter, Shaun Coffel, Dr. Richard Blutstein and Dr. Katherine Baker for the Estate of Benjamin Blutstein, Dr. Richard Blutstein, Dr. Katherine Baker, Rebekah Blutstein, Norman and Nevenka Gritz for the Estate of David Gritz, Norman Gritz, Nevenka Gritz, Bennett and Paula Finer as Legal Guardians for Chana Nachenberg, David Nachenberg, Sara Nachenberg, Bennett Finer, Paula Finer, Zev Finer, Shoshana Finer Ohana, Mina Dora Green, Howard M. Green, Steven Greenbaum for the Estate of Judith Greenbaum, Steven Greenbaum, Alan Hayman, Shirlee Hayman, David Danzig, Rebecca Danzig, Neil Danzig, Hayyim Danzig, Sarah Danzig, Yitzhak Ben-Yishai and Miriam I. Ben-Yishai for the Estate of Shoshana Ben-Yishai, Yitzhak Ben-Yishai, Miriam I. Ben-Yishai, Jacob Ben-Yishai, Israel Ben-Yishai, Chana Ben-Yishai, Yael Ben-Yishai, Abiel Ben-Yishai, Shabtai Scott Shatsky, JoAnne Chava Shatsky, Tzippora Shatsky, Yosef Shatsky, Sara Shatsky Tzimmerman, Miriam Shatsky, David Shatsky, Chana Friedman, Ilan Friedman, Miriam Friedman, Yehiel Friedman, Zvi Friedman, Bella Friedman, Ginette Lando Thaler, Michael Thaler, Leor Thaler, Zvi Thaler, Isaac Thaler, Hillel Trattner, Ronit Trattner, Aron S. Trattner, Shelley Trattner, Steven Braun, Daniel Rozenstein, Julia Rozenstein Schon, Netanel Herskovitz, Martin Herskovitz, Pearl Herskovitz, Yaakov Herskovitz, Temima Spetner, Altea Steinherz, and Jonathan Steinherz, Dr. Alan J. Bauer, Revital Bauer, Yehonaton Bauer, Binyamin B. Bauer, Daniel Y. Bauer, Yehuda Bauer, Jacob Steinmetz, Deborah Steinmetz, Amichai Steinmetz, Nava Steinmetz, Orit Steinmetz, Natanel Steinmetz, Harry Leonard Beer as Executor of the Estate of Alan Beer, Harry Leonard Beer, Anna Beer, Phyllis Maisel, Estelle Carroll, Sarri Anne Singer, Judith Singer, Eric M. Singer, Galit Leibovitch, Shlomo Chaim Leibovitch, Hila Leibovitch, Moshe Nataniel Leibovitch, Shira Leibovitch, Avigail Lewis Biton as the Administrator of the Estate of Gavriel Biton, Avigail Lewis Biton, Elyashiv Biton, Tamar Biton, Noam Biton, Oriya Biton, Shilo Biton, Adi Penina Biton, Rachel Assraf, Eli Assraf, Moshe Assraf, Leslye Knox for the Estate of Aharon Ben-Yisrael Ellis, Leslye Knox, Jordan Terrell Ellis, Reuven Carter,

Shanon Carter, Shayrah Carter, Yoshavyah Carter, Amitai Carter, Prince Elkannann Ben
Shaleak, Mello Nec Ellis, Shemaria Ellis, Francine Ellis, Lynne Ellis, Yehonadav Ellis,
Tsaphrirah Ellis, Shayna Eileen Gould, Ronald Allan Gould, Elise Janet Gould, Jessica
Rine, Shoshana Zeleer, Shmuel Waldman, Henna Novack Waldman, Morris Waldman,
Eva Waldman, Chanie Bodenstein, Shaindey Weinberger, Philip Waldman, Dassie
Waldman, Abraham Waldman, Oz Joseph Guetta, Varda Guetta, Sara Guetta Kleitman,
Rabbi Leonard Mandelkorn, Nurit Mandelkorn, Ezra Kessler, Fortouna Brigitte Kessler,
Chana B. Kessler, Shalom Kessler, Klila Kessler, Mark I. Sokolow, Rena M. Sokolow,
Jamie A. Sokolow, Lauren M. Sokolow, Elana R. Sokolow, Reuven Gilmore and Sheila
Gilmore as Administrators of the Estate of Esh Kodesh Gilmore, Reuven Gilmore, Sheila
Gilmore, Inbal Gilmore Ratz, Talya Gilmore, Malkitzedek Gilmore, Tiferet Gilmore,
Heftizbah Gilmore, Eliana Gilmore, Dror Gilmore, Karen Goldberg, Chana Goldberg,
Esther Goldberg, Yitzhak Goldberg, Shoshana Goldberg, Eliezer Goldberg, Yaakov
Moshe Goldberg, Tzvi Yehoshua Goldberg, Greta Geler as the Administrator for the
Estate of Hannah Rogen, Jaqueline Chambers as the Administrator of the Estate of Esther
Bablar, Jaqueline chambers, Levana Cohen Harooch, Gila Aluf, Yifat Aluf, Uri Aluf,
Tamar Aluf, Barak Aluf, Ruth Aluf, by their attorneys, allege the following upon
information and belief:

## NATURE OF THE ACTION

1. This is a complaint for damages and equitable relief arising out of the conduct of the

Arab Bank, PLC ("Arab Bank") – a Jordanian bank headquartered in Amman, Jordan with a

federally licensed and regulated branch office in the state of New York – pursuant to which it

has and is continuing to knowingly and willfully provide, distribute, and administer the

distribution of financial benefits, money and financial services to (a) terrorists who have

killed, injured and maimed civilians, or attempted to do so, (b) the families and beneficiaries

of such terrorists, and (c) Foreign Terrorist Organizations (as that term is defined in 8 U.S.C.

§ 1189 of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA")), as part of

a scheme to encourage and facilitate acts of international terrorism as defined by 18 U.S.C. §

2331.

2. By these acts, defendant Arab Bank aided and abetted and conspired to commit said

acts of international terrorism, resulting in the killing, attempted killing and maiming of

scores of American citizens in Israel since September 2000, and has violated the prohibitions on providing material support for acts of international terrorism set forth in the Anti-Terrorism Act as amended by the AEDPA ("ATA") (see e.g., 18 U.S.C. §§ 2339A, 2339B and 2339C) and is civilly liable under § 2333(a) of the ATA to those American citizens (and their estates, survivors and heirs) who have been killed or injured in their person, property or business by reason of such acts of international terrorism.

## JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1332(a)(2), and 18 U.S.C. §§ 2333(a) and 2334, as a civil action brought by citizens of the United States, their estates, survivors, and heirs who have been killed or injured by reason of acts of international terrorism. This Court also has subject matter jurisdiction over this action based on diversity of citizenship pursuant to 28 U.S.C. § 1332(a)(2). The matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs. This Court also has supplemental jurisdiction over this action pursuant to 28 U.S.C. § 1367(a).

4. Venue is proper in this district pursuant to 18 U.S.C. § 2334(a) and 28 U.S.C. §§1391(b) and 1391(d).

5. Arab Bank is subject to personal jurisdiction in the state of New York pursuant to N.Y. CLPR § 301 because, among other things, it continuously and systematically does business in the state of New York. Arab Bank also is subject to personal jurisdiction in the State of New York pursuant to N.Y. CPLR § 302 because, based on the facts alleged herein and upon information and belief, Arab Bank (a) transacts business within the State of New York; (b) contracts to supply goods and services in the State of New York; (c) has committed

5

tortious acts within the State of New York and (d) has committed tortious acts outside the State of New York causing injury within the State of New York and (i) derives substantial revenue from goods used or consumed in the State of New York or (ii) expected or should reasonably have expected such acts to have consequences in the State of New York and derived substantial revenue from international commerce. Arab Bank also is subject to personal jurisdiction pursuant to 18 U.S.C. § 2334(a).

## THE PARTIES

### A.    The Plaintiffs

#### THE HEBREW UNIVERSITY CAFETERIA BOMBING - JULY 31, 2002

6.    On the afternoon of July 31, 2002 approximately 100 people were eating lunch in the Frank Sinatra cafeteria on the Hebrew University Mount Scopus campus in Jerusalem. A bomb planted inside the cafeteria exploded, killing nine people and injuring as many as 85 others. Five Americans were killed in the attack, including Janis R. Coulter, Benjamin Blutstein, Marla Bennett, Diane Carter and David Gritz. HAMAS claimed responsibility for the attack.

7.    According to published reports, Mohammed Odeh carried out the attack at Hebrew University where he worked for an Israeli contractor as a painter.

8.    On the night before the attack, Odeh jumped over a fence on the campus and hid the explosives under a bush. The next morning, he walked through the main gate using his employee permit, picked up the bomb and planted it in the cafeteria. He then remote detonated the explosives with a cell phone.

9.    Familiar with the university, Odeh chose the Frank Sinatra Cafeteria as the site for the bombing knowing that few Arabs frequented the cafeteria and that foreign students frequently

6

dined there. Odeh received the explosives from accomplices in the West Bank town of

Ramallah, where the HAMAS cell command was located.

### The Coulter Family

10. Janis Ruth Coulter, a 36 year old United States citizen, was in the cafeteria when the

bomb exploded. She was, at that time, the assistant director of the Hebrew University's

Rothenberg International School's Office of Academic Affairs in New York.

11. Janis had arrived in Israel just one day before the bombing to accompany a group of

19 American students who were scheduled to attend classes at the university. She was killed

while eating lunch in the cafeteria with a friend, who was injured in the blast.

12. Plaintiff Robert L. Coulter, Sr. was watching television news that morning in the

United States when he saw a "news flash" about a bombing at Hebrew University. Thinking

he saw his daughter's head lying in an unsealed body bag. He, then, called his other daughter,

plaintiff Dianne Coulter Miller. Dianne called Janis's boss in New York and both Mr. Coulter

and his daughter desperately tried to reach Janis on her cell phone without success.

13. Plaintiff Robert Coulter, Jr., had heard about bombing on the radio on the way to

work, but didn't make the connection with Janis's visit to Israel. His father called him at

work about the possibility that Janis was at the cafeteria and he then drove immediately to his

father's house.

14. Initially, Janis was identified through only through the numbers on her medical alert

bracelet. Eventually, the family retrieved Janis's dental records and faxed them to Israel

where, later that evening, her death was confirmed.

15. Plaintiff, Robert L. Coulter, Sr., is a United States citizen and a resident of the State of

Massachusetts. He brings this action both individually and on behalf of the Estate of Janis

Ruth Coulter.

16. Plaintiff, Dianne Coulter Miller, is a United States citizen and resident of the State of Massachusetts.

17. Plaintiff, Robert L. Coulter, Jr., is a United States citizen and a resident of the State of Massachusetts.

18. As a result of Janis's death, plaintiff, Robert L. Coulter, Sr., has experienced emotional pain and suffering, loss of his daughter's society, companionship, comfort, advice and counsel and has suffered severe mental anguish and extreme emotional distress.

19. As a result of Janis's death, plaintiff, Dianne Coulter Miller, has experienced emotional pain and suffering, loss of his sister's society, companionship, comfort, advice and counsel and has suffered severe mental anguish and extreme emotional distress.

20. As a result of Janis's death, plaintiff Robert L. Coulter, Jr. has experienced emotional pain and suffering, loss of his sister's society, companionship, comfort, advice and counsel has suffered severe mental anguish and extreme emotional distress.


**The Carter Family**

21. Diane ("Dina") Carter, a 38 year old native of North Carolina and a United States citizen was eating lunch in the cafeteria when the bomb exploded. Ms. Carter moved to Israel in 1990 where she worked as a librarian and archivist in the National Library on the Givat Ram campus of Hebrew University in Jerusalem.

22. Diane Carter was killed by the bomb blast.

23. Her father, Dr. Larry Carter, is a United States citizen and a resident of the State of North Carolina. He learned of his daughter's death from a journalist who called his home.

8

After conferring with his ex-wife, Diane Carter's mother, Dr. Carter was able to confirm that his daughter was, in fact, killed in the bombing.

24. Diane's sister, plaintiff Shaun Coffel, is a United States citizen and a resident of the State of Virginia.

25. Both Dr. Carter and his daughter Shaun learned that Diane had been buried in Israel only moments before the funeral was scheduled to begin. Neither of them had the opportunity to say goodbye to Diane.

26. As a result of Diane Carter's death, plaintiff Larry Carter, has suffered severe mental anguish and extreme emotional distress.

27. As a result of Diane Carter's death, plaintiff Shaun Coffel, has suffered severe mental anguish and extreme emotional distress.


**The Blutstein Family**

28. Benjamin Blutstein, a 25 year old United States citizen and resident of Pennsylvania, was killed in the blast.

29. He came to Israel for a two-year study program at the Pardes Institute in Jerusalem to become a teacher.

30. Benjamin was scheduled to fly home to visit his family in Pennsylvania the day after he was murdered by HAMAS terrorists. Instead, two days after the attack, Benjamin's body was flown home and buried in his parents' home town of Harrisburg, Pennsylvania.

31. Plaintiffs, Dr. Richard Blutstein and Dr. Katherine Baker, bring this action both individually and on behalf of the Estate of Benjamin Blutstein.

9

32. Plaintiff, Dr. Richard Blutstein, is a United States citizen and a resident of the State of Pennsylvania.

33. Plaintiff, Dr. Katherine Baker, is a United States citizen and a resident of the State of Pennsylvania.

34. Plaintiff, Rebekah Blutstein, is a United States citizen and a resident of the State of Pennsylvania. She is the sister of Benjamin Blutstein.

35. Dr. Blutstein first heard about the attack while watching FOX News early in the morning. He then called Benjamin's cell phone and got a recording. Shortly thereafter he contacted friends in Israel to ascertain if Benjamin had been injured in the attack. After a friend made a positive identification, he received a call confirming Benjamin's death.

36. Dr. Baker learned that her son had been killed in the attack when she received a call from a representative of the American Embassy. She was too overwhelmed with emotion to call her husband. Dr. Blutstein received the call from a neighbor, who was with Katherine. Benjamin's mother then composed herself enough to inform her daughter, Rebekah.

37. As a result of Benjamin's death, plaintiff Richard Blutstein has experienced emotional pain and suffering, loss of his son's society, companionship, comfort, advice and counsel and has suffered severe mental anguish and extreme emotional distress.

38. As a result of Benjamin's death, plaintiff, Katherine Baker, has experienced emotional pain and suffering, loss of Benjamin's society, companionship, comfort, advice and counsel and has suffered severe mental anguish and extreme emotional distress.

39. Rebekah Blutstein is a citizen of the United States and a resident of the State of Pennsylvania. She is the younger sister of Benjamin Blutstein. Although her father had informed her about the attack, Dr. Baker was the one who told her that her brother had died.

40. As a result of Benjamin's death, plaintiff Rebekah Blutstein, has experienced emotional pain and suffering, loss of her brother's society, companionship, comfort, protection, advice and counsel and has suffered severe mental anguish and extreme emotional distress.

**The Gritz Family**

41. David Gritz, a 24 year old dual U.S. and French citizen was killed in the explosion. He had come to Israel for the first time with the help of a scholarship from the Hartman Institute to study philosophy and write his doctorate.

42. He died after being in Israel for only two weeks.

43. Plaintiff, Norman Gritz, is a citizen of the United States and France and a resident of Paris. He is the father of David Gritz. Plaintiff, Nevenka Gritz, is a citizen and resident of France. She is the mother of David Gritz, who was an only child.

44. Plaintiffs, Norman and Nevenka Gritz, bring this action both individually and on behalf of the Estate of David Gritz. Mrs. & Mrs. Gritz were in New York on the day their son was murdered. Friends of theirs informed them that television reports had indicated that a bombing had taken place at Hebrew University. The Gritzs attempted to reach their son by phone, and then called the Israeli consulate in the hopes of getting more information. Eventually, confirmation came from the Israeli consulate that David's body had been identified.

45. As a result of David's death, plaintiffs, Norman and Nevenka Gritz, have experienced emotional pain and suffering, loss of their only child's society, companionship, comfort, advice

and counsel and suffered severe mental anguish and extreme emotional distress.

## THE SBARRO PIZZERIA MASSACRE – AUGUST 9, 2001

46.  On August 9, 2001, a suicide bomber detonated a bomb packed with nails and metal bolts.

47.  Fifteen (15) people were killed in this attack and approximately 130 people were injured.

48.  The suicide bomber was identified as Izz Ad-Din Shuhail Ahmad Al-Masri, a terrorist acting on behalf of HAMAS.

49.  The Al-Masri family received at least two (2) payments on account of this act of terrorism through their account at the Arab Bank. The first payment from the Saudi Committee was for twenty thousand (20,000) Riyals converted into five thousand three hundred and sixteen dollars and sixteen cents ($5,316.16) and was designated as Receipt of Transfer No. 1195545058 in its records. The second payment to the family was made to their Arab Bank account through the Al-Ansar charity which made arrangements with the bank manager of the local branch of the Arab Bank to deposit six thousand dollars ($6,000.00) into the Al Masri family account.

50.  As recently as January 10, 2005, HAMAS activists at Bir Zeit University paid tribute to Al Masri as a champion of the Palestinian cause.

### The Nachenberg/Finer Families

51.  On August 9, 2001, Chana and Sara Nachenberg were seated at the Sbarros restaurant in Jerusalem with plaintiffs Mr. and Mrs. Green.  Soon after being seated in the restaurant a

suicide bomber detonated a bomb.

52. Plaintiff, Chana Nachenberg, is a citizen of the United States and a citizen of the State of Israel. Chana is 34 years old and presently resides in Tel Aviv, Israel at a full care facility. Chana is represented by her parents, Paula and Bennett Finer, as her legal guardians because she remains in a coma.

53. Chana and her husband, plaintiff David Nachenberg, have a daughter, Sara, age 6.

54. As a result of the explosion, a nail and a metal bolt entered Chana's body. The nail severed one of her major arteries and became lodged in her chest cavity. Chana suffered extensive internal bleeding. The severance of the artery caused the sac around her heart to fill with blood, causing her heart to stop beating, thus curtailing the blood flow to her brain.

55. Chana Nachenberg never regained consciousness after the attack. On route to the hospital Chana's heart stopped beating before it restarted.

56. For over seven weeks, Chana's condition was unstable. She remained on a respirator. At the end of those seven weeks Chana was moved to another hospital in Tel Aviv. She remained on respirators for the first year and a half after the attack. She now lives in a permanent vegetative state, requiring full time care and daily physical therapy and lives on a respirator.

57. Since the attack Chana has been placed on and off respirators and other machines. Throughout the last three and one half years, Chana has repeatedly contracted pneumonia and endured high fevers.

58. Plaintiff, David Nachenberg, is a citizen of the United States and a citizen and resident of the State of Israel. He is the husband of Chana Nachenberg and the father of Sara Nachenberg.

59. At the time of the attack, David was working at Bank Hapoalim. David received a telephone call from his brother-in-law, Zev Finer, who informed him that there had been a terror attack. Zev advised David that he thought that Sara was not physically injured, but he had no information as to Chana's condition or whereabouts. David became emotionally distraught. After numerous telephone calls and assistance from other employees at the bank, David learned that his wife and daughter were at Hadassah Ein Kerem hospital. Upon arrival at the hospital, David was told that Chana had suffered a severe edema to the brain and was in a coma.

60. For the first 24 hours, David was uncertain if his wife would survive the attack. After that time it appeared that Chana would live, but never regain consciousness.

61. David is now essentially a single parent since Chana remains in a permanent vegetative state and is therefore incapable of assisting in the rearing of her daughter in any manner. He cannot enjoy the normal companionship, day to day assistance and mutual support that he previously received from his wife.

62. David, and his daughter Sara, often visit Chana at her residential medical facility. The facility is located approximately half an hour from their home by bus.

63. As a result of the attack, David Nachenberg has lost the material services, affection, companionship, consortium and the customary amenities of married life and has suffered severe mental anguish and emotional distress, loss of companionship and loss of consortium.

64. Plaintiff, Sara Nachenberg, is a citizen of the State of the United States and the State of Israel. She is the six (6) year old daughter of plaintiffs, David Nachenberg and Chana Nachenberg.

65. On the day of the attack Sara and Chana were seated at the Sbarros restaurant in

14

Jerusalem. After the bombing both she and her mother were transported by ambulance to the hospital.

66. Miraculously, Sara was not outwardly physically injured during the bombing. Sara now visits her mother at the full care facility. She brushes her mother's hair and draws pictures for her. She speaks to her but cannot receive any reply. Sara's only memories are from a time when Chana was already in her current comatose state.

67. As a result of the attack, plaintiff Sara Nachenberg has experienced emotional pain and suffering, permanent loss of his mother's society, protection, companionship, comfort and advice and has suffered severe mental anguish and extreme emotional distress.

68. Plaintiffs, Paula and Bennett Finer, are citizens of the United States and of the State of Israel and are the parents of plaintiff, Chana Nachenberg. They presently reside in Israel.

69. Paula and Bennett Finer are plaintiffs in their own capacity and as the legal guardians of their daughter, Chana Nachenberg.

70. After the bombing Paula Finer received a telephone call from plaintiff, Howard Green, who told her that there had been an attack and that Chana had been hurt. He said nothing about the condition of Paula's granddaughter, Sara Nachenberg.

71. Mr. and Mrs. Finer were driven in their son-in-law's car and began to search from hospital to hospital to try to locate her daughter and granddaughter. After over two hours of searching they finally discovered that their daughter, Chana Nachenberg and their granddaughter had been brought to Hadassah Hospital. They found Sara in the children's ward, covered with debris and in shock. She seemed unable to speak.

72. Eventually they located Chana, whose face was so swollen that Mr. Finer was almost unable to recognize her. She was in a coma and had many tubes connected to her.

73. For over seven weeks, Mr. and Mrs. Finer spent every day at the hospital with their daughter for over ten hours each day, day and night for the first weeks. After Chana was moved to the hospital in Tel Aviv, Mr. and Mrs. Finer continued to visit the hospital for many hours each day.

74. Prior to the attack Mrs. Finer was a teacher. She has not returned to work since the attack because she attends to her daughter on a daily basis.

75. As a result of the attack, Mr. Finer did not work for the first two years after the attack. He has recently returned to work, but still visits Chana in the morning prior to going to work.

76. Paula and Bennett Finer have been unable to communicate with their daughter since the bombing put Chana into a coma.

77. Mr. and Mrs. Finer also assist in the care of the granddaughter, Sara. They help with getting her ready for school and picking her up afterwards when her father is unable to do so.

78. As a result of the attack, Mr. and Mrs. Finer have experienced severe mental anguish, extreme emotional pain and suffering, loss of their daughter's society, companionship, advice and counsel.

79. Plaintiff, Shoshana Finer Ohana, is a citizen of the United States and a citizen and resident of the State of Israel. She is the sister of plaintiff Chana Nachenberg.

80. Shoshana Ohana first learned of the bombing when plaintiff, Howard Green, telephoned the home of her parents, plaintiffs Paula and Bennett Finer. Shoshana tried desperately to locate the hospital where her sister and niece had been taken for treatment. Finally, hours later, Shoshana learned the severity of her sister's injuries when her parents contacted her by telephone.

81. Shoshana and Chana shared a very close relationship. She visits her sister often, but

16

her sister is unable to respond to her visits.

82. As a result of the attack, Shoshana Finer Ohana has experienced severe mental anguish, extreme emotional pain and suffering, loss of society, companionship, comfort, advice and counsel.

83. Plaintiff, Zev Finer, is a citizen of the United States and citizen and resident of the State of Israel. He is the brother of plaintiff, Chana Nachenberg.

84. Zev learned of the attack when his wife telephoned him at work. Upon learning of the attack and the fact that his sister and niece were present at the Sbarros restaurant, he telephoned his brother-in-law, David Nachenberg, and learned the extent of his sister's injuries.

85. Since the attack Zev is fearful of going out to restaurants and crowded places.

86. As a result of the attack, Zev Finer has experienced severe mental anguish, extreme emotional pain and suffering, loss of society, companionship, comfort, advice and counsel.

**The Green Family**

87. Plaintiffs, Howard Green and Mina Dora Green, are citizens of the United States and citizens and residents of the State of Israel.

88. On August 9, 2001, Mr. and Mrs. Green were seated at the Sbarros restaurant in Jerusalem with plaintiffs Chana and Sara Nachenberg. Soon after being seated in the restaurant a suicide bomber detonated a bomb.

89. As a result of the explosion, Mr. Green was hit in the head with an extremely hot piece of an air conditioning duct. The metal hit him on the right side of the head resulting in second degree burns as well as a punctured ear drum.

17

90. Although not physically injured, since the attack plaintiff, Mina Dora Green, has suffered from depression. Both she and her husband suffer from post traumatic stress disorder.

91. As a result of the attack, plaintiff Howard Green has suffered severe physical and mental anguish and extreme emotional distress.

92. As a result of the attack, plaintiff Mina Green has suffered severe mental anguish and extreme emotional distress.

**The Greenbaum Family**

93. Judith Greenbaum, a United States citizen, was a 31 year old graduate student participating in a summer foreign study program in Israel. At the time of her death, Judith Greenbaum had been married just 16 months and was three months pregnant with her first child. Mrs. Greenbaum had been a beloved teacher for many years and left a lasting impression upon hundreds of students.

94. Judith was having lunch in the Sbarro Pizzeria at or about 2:00 p.m. local time, when Izz Ad-Din Shuhail Ahmad Al-Masri walked into the restaurant and detonated an explosive device loaded with shrapnel and nails.

95. As a result of the explosion, Judith Greenbaum was mortally wounded.

96. Plaintiff, Steven Greenbaum, is the husband of Judith Greenbaum and a citizen of the United States. He brings this action both individually and as the representative of his wife's estate. Mr. Greenbaum has experience emotional pain and suffering, the loss of his wife's society, companionship, comfort, protection, marital care, attention, and advice and counsel.

97. As a result of the terrorist attack, Steven Greenbaum has suffered severe mental anguish and extreme emotional distress.

18

98. Plaintiffs, Alan and Shirlee Hayman, are the parents of Judith Greenbaum. They are citizens of the United States.

99. Plaintiff, Steven Greenbaum, woke up on the morning of the bombing in New Jersey and spoke with his wife. After he arrived at work he received a call from his father-in-law, Plaintiff Alan Hayman, telling him that there was a bombing in Israel and that he had tried, unsuccessfully, to locate Judith Greenbaum on her cell phone. Throughout the day, Steven Greenbaum and Alan Hayman were in contact by phone as Alan Hayman called relatives, friends and the school where Judith Greenbaum was a graduate student. As the day went on, they realized that no one in Israel could find Judith. Approximately eight hours after the bombing, Judith Greenbaum's uncle called and told Alan Hayman that he had located Judith Greenbaum's body at the morgue.

100. Thereafter, Judith Greenbaum's uncle telephoned Steven Greenbaum, and advised Steven Greenbaum of Judith's death and inquired of Steven's wishes for Judith. At 7:00 p.m. that evening, Steven Greenbaum boarded a plane to Israel. Steven was met at the airport by a representative from the U.S. State Department who assisted Steven in passing through Customs so that he could go straight to the cemetery to attend his wife's funeral.

101. Because Judith Greenbaum's family desired that she be buried according to Jewish tradition, her funeral had to be scheduled for the next day. Plaintiffs, Alan and Shirlee Hayman, lived in California making it impossible for them to fly to Israel in time for their daughter's funeral. This result caused them tremendous additional grief and anguish.

102. As a result of the terrorist attack, plaintiffs Alan and Shirlee Hayman have experienced severe mental anguish, extreme emotional pain and suffering, loss of their only child's society, companionship, comfort, advice and counsel. Every time Mr. and Mrs.

Hayman travel to Jerusalem, they can see their daughter's gravesite from the highway, which adds to the pain and suffering they will carry with them for the rest of their lives.

**The Danzig Family**

103. Plaintiff David Danzig is a citizen of the United States and a resident of the State of Pennsylvania.

104. On August 9, 2001, the day after David had arrived in Jerusalem, he was sitting with a friend at the Sbarro Pizzeria when the bomber detonated his explosives a few feet from where David was seated.

105. Miraculously, David Danzig was not seriously injured in the blast, but in order to escape from the scene, David had to climb through the wreckage of debris and dead bodies and through the broken windows of the restaurant. As a result of the explosion, David's legs and hands received gashes and he had cuts from flying glass over much of his body. David also temporarily lost his hearing and he was in a state of severe shock.

106. David received many stitches up and down his legs from the injuries caused by the glass. After being treated for his wounds at the hospital, David was released.

107. David Danzig was later diagnosed with severe post traumatic stress syndrome. David's condition required countless therapy treatments and medication. He often has flashbacks and images of the attacks that cause him to experience severe emotional trauma. He has recurring nightmares and continues to have great difficulty sleeping.

108. Upon his return to the United States, David was incapable of continuing his studies in college. He withdrew from his classes and was admitted to a day clinic for depression and anxiety as an outpatient. Although he returned to college for the spring semester, he has been unable to complete his course load.

109. As a result of the attack, plaintiff, David Danzig has suffered severe physical and mental anguish and extreme emotional distress.

110. Plaintiffs, Dr. Rebecca Danzig and Dr. Neil Danzig, are citizens of the United States and residents of the State of Pennsylvania. They are the parents of David Danzig.

111. Plaintiff Hayyim Danzig is a citizen of the United States and a resident of the State of Pennsylvania. He is the younger brother of David Danzig.

112. On the day of the attack, Rebecca and Neil Danzig received a telephone call from their son, plaintiff Hayyim Danzig, informing them that there had been a bombing in Jerusalem and inquiring as to whether David had been involved.

113. Rebecca Danzig telephoned her father and step-mother, who reside in Jerusalem, to ascertain David's whereabouts. After receiving no information, Mrs. Danzig called again, and was told that David had been at the bombing and had been brought to the hospital.

114. Plaintiff, Sarah Danzig, is a citizen of the United States and a resident of the State of Pennsylvania.

115. Sarah learned that her brother had been injured in the bombing when her parents notified her at a camp for children diagnosed with cancer.

116. Each of the members of the Danzig family has attended therapy sessions to address the emotional trauma caused by the attack.

117. As a result of the attack, plaintiffs Rebecca Danzig, Neil Danzig, Hayyim Danzig and Sarah Danzig have suffered severe mental anguish and extreme emotional distress.

## JERUSALEM BUS SHOOTING: NOVEMBER 4, 2001

### The Ben-Yishai Family

118. On November 4, 2001, Shoshana Ben-Yishai, a 16 year old eleventh grade student

boarded Egged Bus #25 to return home from school.  At approximately 3:45p.m. a gunman, armed with an M-16 rifle, opened fire at the bus as it waited at a stop light.

119.  Shoshana Ben-Yishai was shot in the head and killed in the attack.  Another student was killed and twenty-five people, mostly students, were injured.

120.  The terrorist was a member of the Palestinian Islamic Jihad (PIJ).  He was eventually killed fleeing the scene of the attack.

121.  The terrorist was later identified as Hatem Yaqin Ayesh Al-Sheweikeh .  For his murderous acts, his family received a payment through its account at the Arab Bank from the Saudi Committee for twenty thousand (20,000) Riyals which was converted into U.S. dollars and paid to the family's Arab Bank account as five thousand three hundred and sixteen dollars and sixteen cents ($ 5,316.16).

122.  Plaintiff, Miriam Ben-Yishai, is a citizen of the United States and a citizen and resident of the State of Israel.  She is the mother of Shoshana Ben-Yishai.  Plaintiff, Yitzhak Ben-Yishai is a citizen and resident of the State of Israel and is the father of Shoshana Ben-Yishai.  Miriam and Yitzhak Ben-Yishai bring this action individually and on behalf of the Estate of Shoshana Ben-Yishai.

123.  Plaintiff Yitzhak Ben-Yishai heard news on the radio that there had been an attack on Bus #25.  Knowing that Shoshana took this bus, he rushed to the scene.  The news report had indicated that people had been only slightly wounded.  He attempted to contact Shoshana on her mobile phone, but there was no response.  He was permitted to look for Shoshana, but could not find her.

124.  After hearing about the attack, plaintiff, Miriam Ben-Yishai, telephoned many hospitals, searching for news of her daughter.  Someone finally advised Miriam that Shoshana

22

had received head injuries and had been taken to Share Tzedek Hospital in Jerusalem.

125.  Upon arrival at the hospital Miriam met her husband and they identified Shoshana's body, which they found on the floor of the hospital morgue, covered by a sheet.

126. As a result of the attack, and the death of their daughter, plaintiffs, Miriam and Yitzhak Ben-Yishai, have experienced severe mental anguish, extreme emotional pain and suffering, loss of their daughter's society, companionship, comfort, advice and counsel.

127.  Plaintiffs, Jacob Ben-Yishai,  Israel Chai Ben-Yishai, Chana Ben-Yishai, Yael Ben-Yishai and Abiel Ben-Yishai are citizens of the United States and are siblings of Shoshana Ben-Yishai.

128.  As a result of the attack, and the death of their sister, plaintiffs, Jacob Ben-Yishai, Chana Ben-Yishai, Yael Ben-Yishai , Israel Chai Ben-Yishai and Abiel Ben-Yishai have experienced severe mental anguish, extreme emotional pain and suffering, loss of their sister's society, companionship, comfort, advice and counsel.


### THE KARNEI SHOMRON PIZZERIA BOMBING OF FEBRUARY 16, 2002

129.  Three teenagers were killed and 28 other people wounded, six seriously, when a suicide bomber blew himself up next to a crowded pizzeria on Saturday night, February 16, 2002 in the Yovelim shopping mall in Karnei Shomron. Two of the teenagers murdered and several of the injured were U.S. citizens.

130.  The terrorist was an operative of one of the paramilitary factions of the Palestine Liberation Organization (PLO).

131.  The terrorist was later identified as Sadiq A'id Mahmud Abd al-Hafez.

132.  The al-Hafez family of Qalqiliya received a payment through its account at the Arab

23

Bank from the Saudi Committee for twenty thousand (20,000) Riyals converted into five thousand three hundred and sixteen dollars and sixteen cents (S 5,316.16) ) which was designated as Receipt of Transfer No. 2195593571.

## The Shatsky Family

133. On February 16, 2002, 14-year old Keren Shatsky was sitting in a pizzeria with plaintiff Chana Friedman and other friends when a Palestinian terrorist detonated a large bomb, killing one other child immediately and injuring dozens of others. Keren was hit by shrapnel in the back of her neck and was killed as a result of the attack.

134. Plaintiff, Shabtai Scott Shatsky, is a citizen of the United States and a citizen and resident of the State of Israel. He is the father of Keren Shatsky.

135. Plaintiff, JoAnne Chava Shatsky, is a citizen of the United States and a citizen and resident of the State of Israel. She is the mother of Keren Shatsky.

136. Immediately after the attack plaintiff, Shabtai Scott Shatsky, learned there had been a bombing at the nearby shopping mall. As a member of the emergency response team he went to the site unaware that his 14-year old daughter, Keren had been a victim of the bombing that took place at the pizzeria.

137. While at the site he learned that Keren's friends had been at the mall but he returned home. There, he and his wife, plaintiff, JoAnne Chava Shatsky, made numerous calls to determine Keren's whereabouts. Eventually, he and JoAnne learned that Keren had died as a result of the attack.

138. Shabtai and JoAnne went to the morgue and identified Keren's body.

139. As a result of the attack and the death of their daughter, plaintiffs, Shabtai Scott Shatsky and JoAnne Shatsky, have suffered have experienced severe mental anguish,

extreme emotional pain and suffering, loss of their daughter's society, companionship, comfort, advice and counsel.

140. Plaintiffs, Tzippora Shatsky, Yosef Shatsky, Sara Shatsky Tzimmerman, Miriam Shatsky and David Shatsky, are citizens of the United States and citizens of the State of Israel. They are siblings of Keren Shatsky.

141. As a result of the attack, and the death of their sister, plaintiffs, Tzippora Shatsky, Yosef Shatsky, Sara Shatsky Tzimmerman, Miriam Shatsky and David Shatsky, have experienced severe mental anguish, extreme emotional pain and suffering, loss of their sister's society, companionship, comfort, advice and counsel.

**The Friedman Family**

142. Plaintiff, Chana Friedman, is a citizen of the United States and a citizen of the State of Israel.

143. Chana, the late Keren Shatsky and some of her other friends went out for pizza on Saturday night. While seated at the table Chana saw a man coming towards the table and he detonated his explosives, and there was a loud explosion. Chana remembers running down the road where a bus spotted her and she told the bus driver that the mall had been bombed. The bus driver took Chana to a local Magen David Adom (Red Cross) station which drove her to an intensive care unit.

144. Chana sustained second degree burns and shrapnel wounds in her face, legs, chest and right eye. Her eardrum had also ruptured as a result of the blasts. She underwent an operation to remove shrapnel from her body which resulted in the formation of a deep hole in her leg. It was impossible to safely remove all of the shrapnel from her body.

145. Chana required outpatient treatments for six months and lost more than a year of

school as a result of her injuries. She continues to experience severe psychological trauma not only from being a victim of the bombing, but from the loss of her closest friend, Keren Shatsky.

146.   As a result of the bombing, plaintiff, Chana Friedman, has suffered severe physical and mental anguish and extreme emotional distress.

147.   Plaintiff, Bella Friedman, is a citizen of the United States and a citizen of the State of Israel. She is the mother of plaintiff, Chana Friedman.

148.   On the night of the attack, Mrs. Friedman received a telephone call from her son, Ilan, who had heard there had been a bombing in the neighborhood. Not knowing where Chana was, Mrs. Friedman drove to the mall and ran to the location of the explosion. No one at the scene seemed to know where Chana was. Finally, she asked someone to go into the remains of the pizzeria and determine if Chana was inside.

149.   Shortly thereafter, Keren Shatsky's sister informed Mrs. Friedman that Keren had been located and had been sent to a hospital in Kfar Saba. At the time both Keren's sister and Mrs. Friedman thought Keren was injured, not deceased. Since the neighborhood nurse had told the Friedmans that one girl had died at the scene, and knowing that the girls were together, Mrs. Friedman was certain that Chana had been killed.

150.   Mrs. Friedman eventually received a telephone call from Chana letting her know that she had survived.

151.   Plaintiff, Bella Friedman, has suffered an economic loss since she was unable to work for two months in order to care for Chana. She also took additional time off from work to take Chana to many doctor appointments.

152.   As a result of the terrorist attack, plaintiff, Bella Friedman, has suffered severe

mental anguish and extreme emotional distress.

153.  Plaintiffs, Yehiel Friedman, Zvi Friedman, Ilan Friedman and Miriam Friedman, are citizens of the United States and citizens of the State of Israel.  They are the siblings of Chana Friedman.

154. As a result of the injuries sustained by their sister as a result of the attack, plaintiffs Yehiel Friedman, Zvi Friedman, Ilan Friedman and Miriam Friedman, have suffered severe mental anguish and extreme emotional distress.

### The Thaler Family

155.  Rachel Thaler was a citizen of the United States.

156.  Ginette Lando Thaler is a citizen of Great Britain and of the State of Israel.  She is the mother of Rachel Thaler and plaintiffs Leor and Zvi Thaler.

157.  Ginette LandoThaler brings this action both individually and on behalf of the Estate Rachel Thaler.

158.  On February 16, 2002, plaintiff, Ginette Lando Thaler, brought her 16-year old daughter, Rachel Thaler, to the mall to spend time with some friends.  Less than half an hour later, a Palestinian terrorist detonated a large bomb packed with nails and metal bolts in a pizzeria, killing two children immediately and injuring dozens of others.

159.  As a result of the bombing, shrapnel lodged in her skull, and the main artery in her neck was virtually severed, rendering her brain dead.  Rachel sustained multiple injuries all over her body, most significantly to her face, head and neck.  Her body was covered with first and second degree burns. Rachel never regained consciousness and died eleven days after the attack.

160.  Rachel's 14-year old brother, plaintiff Leor Thaler, was also at the site of the attack

27

when the explosion was detonated. Leor was there with his best friend, who was killed as a result of the bombing.

161. As a result of the attack, Leor Thaler was hit by several nails and bolts. Many nails were lodged in his stomach and he also received serious second degree burns. His arms and legs were covered with shrapnel wounds.

162. Leor underwent a number of operations including ones to remove the nails in his stomach and the removal of his spleen.

163. Leor continues to suffer from hearing loss and still has shrapnel lodged in his body.

164. As a result of the death of his sister, his best friend and the pain and suffering caused by his own injuries, Leor suffered both severe physical and mental anguish and extreme emotional distress.

165. Ginette Thaler heard the sound of the bomb when it was detonated. She knew Rachel was at the mall but believed that Leor was at a friend's house.

166. Upon arrival at the scene she was not permitted to search for her children.

167. While at the site, she learned that Leor and his friend were at the mall but could not be found. Finally, a few hours later she learned the name of the hospital to which Rachel had been taken. While on route she was told that Leor had been taken to a different hospital and was in critical condition.

168. For five days, Ginette traveled back and forth from hospital to hospital to check on the condition of her two children. A few days later Leor was transferred to the hospital that was caring for Rachel.

169. As a result of the death of her daughter and the injuries sustained by her son, Ginette Thaler suffered severe mental anguish and extreme emotional distress. The death of Rachel

28

Thaler has caused her mother severe mental anguish, extreme emotional pain and suffering, loss of her daughter's society, companionship, comfort, advice and counsel.

170. Plaintiff, Michael Thaler, is a citizen of the United States and a citizen of the State of Israel. He is the father of Rachel Thaler and plaintiffs Leor Thaler, Zvi Thaler, and Isaac Thaler.

171. At the time of the attack Michael resided in Jacksonville, Florida. At around 8:30pm Michael turned on the website "News from Israel" and learned there had been a bombing at the mall near where his children lived. He immediately tried to call Ginette, but there was no answer even though it was after 2:00 in the morning Israel time. This caused Michael great concern and distress.

172. Thereafter, Ginette contacted Michael and informed him that both Rachel and Leor had been injured in the bombing. He was told his daughter was unconscious and in very serious condition, and that his son had nails in his body as a result of the blast.

173. Michael boarded the first flight available to Israel the following morning. While on the airplane he read about the bombing in the newspaper, realizing that the unidentified girl described to be unconscious and the boy who had significant injuries including nails in his body were, in fact, his own children.

174. Upon arrival in Israel, Michael immediately went to the hospital to see Rachel. He found her unconscious and hooked up to numerous machines. When he saw Leor, Michael found him badly burned over his face and hands and in poor condition.

175. Michael remained in Israel to attend the burial of his 16-year old daughter, Rachel and assist in Leor's slow recovery.

176. As a result of the death of his daughter and the injuries sustained by his son, Michael

Thaler suffered severe mental anguish and extreme emotional distress. Rachel's death has caused Michael Thaler to experience severe mental anguish, extreme emotional pain and suffering, loss of his daughter's society, companionship, comfort, advice and counsel.

177.    Plaintiff, Zvi Thaler, is the younger brother of Rachel Thaler and plaintiff Leor Thaler. He is a citizen of the United States and of the State of Israel.

178.    He has lost the companionship of his sister, Rachel.

179.    As a result of the death of his sister and coping with the injuries sustained by his brother Leor, Zvi Thaler has suffered severe mental anguish, extreme emotional pain and suffering, loss of his sister's society, companionship, comfort, advice and counsel.

180.    Plaintiff, Isaac Thaler, is the older half brother of Rachel Thaler and Leor Thaler. He is a citizen of the United States and a citizen of the State of Israel. He is a resident of the State of Florida.

181.    Prior to the attack, Isaac maintained a very close relationship with his sister and brothers. When visiting in the United States, his brothers and sister would spend time together with him.

182.    Isaac learned of the bombing that killed his sister and injured his brother when his father contacted him by telephone. He flew to Israel to sit by Rachel's bedside and attended his younger sister's funeral a few days later.

183.    Isaac continues to experience a great feeling of loss since the attack that killed his sister and injured his brother.

184.    As a result of the death of his sister and the injuries sustained by his brother Leor, Isaac Thaler has suffered severe mental anguish, extreme emotional pain and suffering, loss of his sister's society, companionship, comfort, advice and counsel.

**The Trattner Family**

185. Plaintiff, Hillel Trattner, is a citizen of the United States and a resident and citizen of the State of Israel.

186. Plaintiff, Ronit Trattner, is a citizen and resident of the State of Israel.

187. On February 16, 2002, plaintiffs, Hillel Trattner and Ronit Trattner, stopped to eat at a local pizzeria when a Palestinian terrorist detonated a large bomb, killing Keren Shatsky and Rachel Thaler and injuring dozens of others, including the Trattners.

188. As a result of the explosion, Hillel Trattner was struck in the head by shrapnel and sustained nerve damage to his left eye. His left eardrum was ruptured requiring Hillel to undergo an operation on that ear. The surgery was only partially successful and he continues to suffer from hearing loss in his left ear. Hillel further suffered from an impairment of his speech for a period of time.

189. To this day, shrapnel remains lodged in Hillel's brain and it remains unclear whether the shrapnel will cause further injury to him in the future.

190. The heat of the blast burned his face and hands. He sustained nerve damage to his fingers and the sole of his foot. Shrapnel remains in his right hand and was removed from his ankle.

191. After the attack, Hillel was taken to the hospital where he remained for ten days before being transferred to a rehabilitation center, but after a bad reaction to the prescribed medication, he returned to the hospital for an additional two weeks before returning to the rehabilitation center for nearly three months. The reaction to the medication also caused serious liver damage, requiring Hillel to spend a week in the intensive care unit. He also underwent physical therapy throughout this time.

192. Hillel no longer has vision in his left eye. He continues to have his eye examined every three months to determine if the damage has spread to his right eye.

193. As a result of the attack, Hillel Trattner has suffered severe physical and mental anguish and extreme emotional distress.

194. Plaintiff, Ronit Trattner, was seated next to Hillel when the bomber detonated his bomb. She sustained burns to her face, legs, and hands. She was also hit with shrapnel which remains lodged in her legs. She has required additional treatment for the burns and scarring on her feet.

195. As a result of the attack, Ronit Trattner has suffered severe physical and mental anguish and extreme emotional distress.

196. Plaintiffs, Aron Trattner and Shelley Trattner, are citizens of the United States. They are the parents of Hillel Trattner.

197. On the evening of the attack, Aron and Shelley Trattner heard an explosion. Their television showed that there had been a bombing nearby. They attempted to call Hillel on his cell phone, but there was no response.

198. They went to the location of the bombing and found Hillel's car, but there was no sign of their son. They eventually learned that Hillel had been transported to the hospital. Once Mr. and Mrs. Trattner located Hillel in the hospital, they could barely recognize him. His face and eye area were horribly swollen. He was unconscious and could only be recognized by his wristwatch.

199. As a result of the attack, Aron Trattner and Shelley Trattner have suffered severe mental anguish and extreme emotional distress.

32

### Steven Braun

200. Plaintiff, Steven Braun, is a citizen of the United States and a citizen of the State of Israel.

201. On February 16, 2002, he was standing outside a store window not far from the pizzeria at the Karnei Shomron mall when A'id Mahmud Abd al-Hafez detonated his explosives.

202. Steven was thrown back as a result of the blast, and immediately felt extreme pain in his legs. His pants had been torn, and both of his legs had been hit by flying shrapnel which resulted in numerous cuts and bruises. In addition to blood, Steven saw pieces from a human body on his right leg. At first, Steven believed his leg had been ruptured, but later realized that the pieces of flesh belonged to the bomber or another victim of the attack.

203. After the initial shock, Mr. Braun attempted to assist other victims and the paramedics that arrived on the scene. He personally witnessed the carnage and saw the bodies of dead girls and many maimed and injured survivors.

204. As a result of the attack, Steven Braun has difficulty sleeping and suffers from post-traumatic stress and has experienced both physical anguish and severe mental anguish and extreme emotional distress.

## THE MIKE'S PLACE BOMBING: TEL AVIV, APRIL 30, 2003

### The Rozenstein Family

205. On April 30, 2003 a suicide bomber entered Mike's Place, a popular bar situated on the seashore a few hundred meters from the American Embassy in Tel Aviv.[1]

---

[1] There were actually two (2) bombers, both British nationals sent by HAMAS, but the explosive belt on one of them failed to detonate.

206. The attack was perpetrated by Asif Muhammad Hanif, 22, a British citizen who entered Israel through Jordan. He was sent by HAMAS.

207. Plaintiff Daniel Rozenstein is a citizen of the United States. He was seated inside the bar and decided to step outside when he crossed paths with Asif Muhammad Hanif in the entry way just as Hanif detonated his explosives.

208. As a result of the attack, Daniel suffered 3rd degree burns over his entire body. Since his back was to the bomber, Daniel's back bore the brunt of the explosion.

209. After three days in the hospital, Daniel slipped into a coma that lasted eight days. He was placed on a respirator and other life supports for over a week. He remained in the hospital for one and a half months, followed by eight months of treatment as an outpatient.

210. Since the bombing he sustained severe hearing loss. He cannot maintain his balance, is often dizzy, and frequently experiences black outs. His right hand, no longer functions properly as it is covered in scar tissue. Much of his body is covered by scar tissue, including his back and hands.

211. As a result of the attack, plaintiff, Daniel Rozenstein, has suffered severe physical and mental anguish and extreme emotional distress.

212. Plaintiff, Julia Rozenstein Schon, is a citizen of the United States. She is the sister of plaintiff, Daniel Rozenstein.

213. On the night of the bombing, Julia received a telephone call from the father of Daniel's girlfriend. She was told there was an attack but that no one was certain of Daniel's condition.

214. When Julia first saw Daniel she could not recognize him because his body was horribly burned and his face and ears were swollen beyond recognition. She spent many

days in the hospital, and was there when her brother slipped into a coma.

215. Julia still suffers nightmares and is traumatized by the attack. Even now, she calls her brother compulsively to be certain that he is not in danger.

216. As a result of the attack, plaintiff, Julia Rozenstein Schon, has suffered severe mental anguish and extreme emotional distress.

## GAS STATION BOMBING NEAR KFAR SAVA – MARCH 28, 2001

### The Herskovitz Family

217. In the early morning of March 28, 2001, Fadi Attallah Yusuf Amer, a HAMAS trained terrorist blew himself up outside a gas station near Kfar Sava, killing two teenagers waiting for a bus to take them to the Bnei Hayil Yeshiva in Kedumim. A large quantity of nails was packed with the bomb. HAMAS claimed responsibility and issued a statement.

218. The Amer family of Qalqilya received a payment through its account at the Arab Bank from the Saudi Committee for twenty thousand (20,000) Riyals which was converted by Arab Bank into five thousand three hundred and sixteen dollars and sixteen cents ($ 5,316.16) with the designated Receipt of Transfer No.1195545071.

219. Plaintiff, Netanel Herskovitz, who was sixteen (16) years old at the time of the terrorist attack, is a citizen of the State of the United States and the State of Israel. He was sitting, eating a sandwich outside the gas station when Fadi Attallah Yusuf Amer blew himself up. Netanel was struck in the shoulder and forehead by shrapnel and glass fragments penetrated one eye, leaving him partially blind. Netanel Herskovitz has also experienced partial hearing loss and suffers from post-traumatic stress disorder. As a result of the attack

plaintiff, Netanel Herskovitz, has suffered severe physical and mental anguish and extreme emotional distress.

220. Plaintiffs Martin & Pearl Herskovitz are citizen of the State of the United States and the parents of Netanel Herskovitz. They learned of the attack and the fact that their son was injured from the family of another boy who had been lightly injured at the scene, and called home on his cell phone. Plaintiff, Pearl Herskovitz, works at the hospital where Netanel was taken for treatment and quickly located her son in the emergency room area.

221. Plaintiff, Yaakov Herskovitz, is a citizen of the State of the United States and the State of Israel the older brother of Netanel. He was home when the family received word that Netanel had been seriously injured in a terrorist attack.

222. As a result of the attack, plaintiffs Martin Herskovitz, Pearl Herskovitz and Yaakov Herskovitz have suffered severe mental anguish and extreme emotional distress.

## THE BEN YEHUDA BOMBINGS: DECEMBER 1, 2001

223. In the late evening of December 1, 2001, Nabil Halabiya and Osama Mohammad Id Bahr, two HAMAS trained terrorists blew themselves up in a pedestrian mall in Jerusalem as part of a coordinated double suicide bombing (followed by a coordinated car bombing). A large quantity of nails was packed with each of the bombs. Eleven people were murdered and over one hundred people were injured. Mr. Bahr had been recruited by Jamal al-Tawil the chairman of the Al-Islah Charitable Society since 2000. The Al-Islah Charitable Society is one of HAMAS's key charitable front organizations in the West Bank.

224.  Subsequent to the two suicide bombings terrorists detonated a car bomb near the site of the first two attacks.  HAMAS also claimed responsibility for this attack.

225.  The Bahr family of Abu Dis, near Jerusalem received a payment through its account at the Arab Bank from the Saudi Committee for twenty thousand (20,000) Riyals converted into five thousand three hundred and sixteen dollars and sixteen cents ($ 5,316.16).

**The Spetner Family**

226. Temima Spetner is a citizen of the United States and a resident of the State of Missouri. She was walking down the pedestrian mall in Jerusalem when one of the suicide bombers detonated his explosives approximately 10 yards from where she was standing. While bleeding heavily, and with clothing soaked in blood, Temima began running up the walkway and fell.  Someone came to her aid and attempted to stop the bleeding until ambulances arrived at the scene.  Additionally, Temima was hit by shrapnel on her arms and fingers.

227.  As a result of the terrorist attack, the femoral artery of Temima's right leg was severed.  She was transported to the hospital where doctors operated on her to stop the bleeding.  The following day it was determined that Temima's intestines had been punctured by shrapnel and she underwent another operation to repair her intestines and remove most of the shrapnel.  Temima remained in the hospital for ten days.

228.  There is significant scarring on Temima's thigh and the lower part of her abdomen. She continues to experience numbness in her right leg and is highly sensitive to pain in that leg.

229. Temima has also experienced psychological trauma as a result of the attack.  As a result of the attack, plaintiff, Temima Spetner, has suffered severe physical and mental

37

anguish and extreme emotional distress.

### The Steinherz Family

230. Plaintiff Altea Steinherz and plaintiff Jonathan Steinherz are citizens of the United States.

231. Plaintiff's, Jonathan and Altea Steinherz, are husband and wife.

232. On December 1, 2001, Altea Steinherz was nine months pregnant. Altea and Jonathan were at a restaurant in Jerusalem when they heard a bomb explode nearby. A short time later they heard another bomb explode. Believing the bombing was over, they began to walk home.

233. While walking in the street they saw a crazed man ran past them. Altea insisted that the couple turn around, away from the direction from which the man had come. They heard a third explosion from where the man had run. They later learned that the explosion was the result of a car bomb.

234. As they began to run, Altea fell twice, and broke her arm as a result of the fall.

235. Until her son, Yitzhak, was born eleven days later, Altea and Jonathan feared for the condition of their unborn child.

236. Having personally seen the emergency efforts and fears of individuals at the hospital after the attack, Altea no longer feels she can continue to volunteer at the hospital as she had done previously. She has become more fearful in general.

237. As a result of the attack, Altea Steinherz and Jonathan Steinherz have suffered severe mental anguish and extreme emotional distress.

## THE KING GEORGE STREET BOMBING: MARCH 21, 2002

### The Bauer Family

238. Plaintiff, Dr. Alan Bauer, is a citizen of the United States. He is the father of plaintiff, Yehonaton Bauer.

239. Plaintiff, Yehonaton Bauer, is a citizen of the United States and of the State of Israel.

240. On March 21, 2002 Dr. Alan Bauer and his son, Yehonaton Bauer, were walking home when a suicide bomber got out of a car and detonated explosives near where Alan and Yehonaton were standing.

241. The Al Aqsa Martyrs' Brigades took responsibility in a telephone call to the Associated Press, and identified the bomber as Muhammad Hashaika, 22, of Taluza, north of Nablus. The attack killed at least two people and wounded more than eighty others, including a woman pregnant with twins and her husband.

242. Dr. Bauer was thrown to the ground and saw smoke everywhere.

243. He finally located his son, who was on the ground, unconscious. Yehonaton was struck by part of a screw that had been packed with the explosives. The screw passed through his brain from the back to the front of his head.

244. Dr. Bauer was struck by two nails that severed two arteries in his left arm. One passed through and the other was lodged in his arm.

245. Both Dr. Bauer and his son were operated on after the attack.

246. Yehonaton remained in the pediatric Intensive Care Unit for three and a half weeks. He was later transferred to a children's rehabilitation center for two months and continued with outpatient care.

247. Yehonaton continues to experience physical difficulties as a result of the attack. He

limps on his left side and his motor skills in his left hand are limited. His vision is impaired as well.

248. As a result of the attack plaintiff Yehonaton Bauer has suffered severe physical and mental anguish and extreme emotional distress.

249. Dr. Bauer continues to experience restrictive use of his left arm. He has had two skin grafts to cover the scarring in that injured area.

250. As a result of the attack plaintiff Dr. Alan Bauer has suffered severe physical and mental anguish and extreme emotional distress.

251. Plaintiff Revital Bauer is a citizen of the State of Israel. She is the wife of plaintiff Alan Bauer and the mother of plaintiff Yehonaton Bauer.

252. Immediately after the attack Alan Bauer telephoned Revital informing her that he and Yehonaton had been in an attack. The conversation was unclear and she could not hear all of the information. She had to wait for a further call from the hospital.

253. Half an hour later she received a telephone call from the hospital informing her as to the location of her husband, but the hospital had no word on the condition of her son.

254. Revital's brother drove her to the hospital and saw Yehonaton prior to his surgery. Since Alan was also undergoing an operation, she spent hours going between the two operating rooms.

255. Revital had to wait to learn the extent of her son's brain injuries.

256. As a result of the attack plaintiff Revital Bauer has suffered severe mental anguish and extreme emotional distress.

257. Plaintiffs, Binyamin B. Bauer, Daniel Y. Bauer, and Yehuda Bauer are citizens of the United States. They are the sons of plaintiffs Alan Bauer and Revital Bauer and the

younger brothers of plaintiff Yehonaton Bauer.

258.    As a result of the attack plaintiffs, Binyamin Bauer, Daniel Bauer, and Yehuda Bauer, have lost their brother's companionship for an extended period of time and have suffered severe mental anguish and extreme emotional distress.

## SHOOTING ATTACK ON ROAD #60: JANUARY 29, 2003

### The Steinmetz Family

259.    Plaintiffs, Jacob Steinmetz, and Deborah Steinmetz are citizens of the United States.

260.    On January 29, 2003 Jacob Steinmetz was driving their car on Road #60. Mrs. Steinmetz sat in the front passenger seat of the car. As their car made a turn, two masked men began shooting the car. The entire driver's side of the car was covered with bullets.

261.    It is believed that HAMAS was responsible for the attack.

262.    Two bullets hit Mr. Steinmetz. One shot passed through the car seat and lodged in his leg. The other shot entered his arm and passed through the elbow.

263.    After arriving at the hospital and over the next few days, Mr. Steinmetz underwent a number of operations.

264.    Four metal spikes were surgically inserted into his bone in order to restrain the arm. This remained for three months and severely restricted the mobility of his arm. Additional plastic surgeries were performed. Mr. Steinmetz received a skin graft from his leg to cover the opening in his elbow.

265.    In 2003, Mr. Steinmetz underwent a complete elbow replacement that included the placement of a large metal hinge.

266.    Presently, the use of Mr. Steinmetz's arm is greatly limited.

41

267. As a result of the attack, Mr. Steinmetz has suffered severe physical and mental anguish and extreme emotional distress.

268. As a result of being in the car that terrorists targeted, Mrs. Steinmetz experiences great anxiety and has suffered severe mental anguish and extreme emotional distress.

269. Plaintiffs, Amichai Steinmetz, Nava Steinmetz, Orit Steinmetz and Natanel Steinmetz, are the children of Jacob and Deborah Steinmetz.

270. As a result of the attack, Amichai Steinmetz, Nava Steinmetz, Orit Steinmetz and Natanel Steinmetz have suffered severe mental anguish and extreme emotional distress.

## THE JAFFA ROAD BUS #14A BOMBING: JUNE 11, 2003

271. At approximately 5:30 p.m. on June 11, 2003, the bomber, a HAMAS operative dressed as an ultra-Orthodox Jew, boarded Egged bus No. 14A at the Mahane Yehuda market, and a short while later, as the bus drove down Jaffa Road near the Davidka Square, detonated his bomb, wrecking the bus and killing 16 of its passengers. Over 100 people were wounded, including dozens of bystanders.

### The Beer Family

272. Alan Beer, a citizen of the United States, was on the bus returning from a condolence call to his friend's family when the bomber detonated his explosives. He was one of the at least sixteen (16) commuters killed by the blast.

273. Mr. Beer's friend, to whom he had paid the condolence call, learned of the bus bombing and telephoned plaintiff, Harry Leonard Beer, in Cleveland, Ohio. Harry Leonard Beer quickly telephoned his sister, plaintiff Phyllis Maisel, whose son happened to be on the scene of the bombing earlier. He then telephoned his other sister, plaintiff Estelle Carroll, of

42

Virginia and informed her of the terrorist attack.

274. After speaking with her brother, Mrs. Maisel asked her son to return to the crime scene and identify Alan Beer's body. Thereafter, plaintiffs Anna Beer, Harry Leonard Beer and Estelle Carroll flew to Israel to attend Alan Beer's funeral.

275. Plaintiff, Harry Leonard Beer, brings this action both in his individual capacity and as the Executor of the Estate of Alan Beer. He has experienced emotional pain and suffering, the loss of his brother's companionship, advice and counsel.

276. As a result of the terrorist attack, Harry Leonard Beer has suffered severe mental anguish and extreme emotional distress.

Plaintiffs, Estelle Carroll and Phyllis Maisel are both U.S. citizens. Each of them has experienced emotional pain and suffering, the loss of their brother's companionship, advice and counsel. As a result of the terrorist attack, they have suffered severe mental anguish and extreme emotional distress.

277. Plaintiff, Anna Beer, is a U.S. citizen and a resident of the State of Ohio. She has experienced emotional pain and suffering, the loss of her youngest child's companionship, advice and counsel. As a result of the terrorist attack, she has experienced the loss of her youngest son's society, companionship, advice and counsel and has suffered severe mental anguish and extreme emotional distress.

**The Singer Family**

278. Plaintiff, Sarri Anne Singer, is a citizen of the United States and is a resident of the State of New Jersey.

279. On June 11, 2003, Sarri Anne Singer boarded bus number 14A in Jerusalem to meet a friend for dinner. It was around 4:45pm, and the bus was filled with rush hour commuters.

43

Eventually she was able to take a seat near the window.

280. Soon thereafter a suicide bomber detonated his bomb only two to three seats away from where she was seated. The bomber killed everyone sitting and standing near her. The roof of the bus had fallen in and the man in front of her was not moving. When the explosives were detonated, Sarri felt a shockwave across her face. At least sixteen (16) people were killed in the attack, and over 100 were injured.

281. The attack was perpetrated by a HAMAS bomber, identified as Abdel Madi Shabneh, an 18-year old high school student from Hebron. He had boarded the bus disguised as an Orthodox Jew.

282. Shabneh was initially recruited by HAMAS while playing at a local Jihad Mosque soccer team.

283. Sarri was struck with shrapnel from the explosion, which entered her shoulder and broke her clavicle. After the blast she was unable to open her left eye, and her right eye was extremely restricted. She was unable to hear because of a loud ringing in her ears, and her eardrums ruptured. Barely walking, she was taken to an ambulance.

284. She received wounds to her face and legs resulting in scarring. She has undergone physical therapy and will require surgery in the future. Shrapnel had lodged in her gums moving her teeth. She will have need of dental work in the future.

285. As a result of the attack, Sarri Anne Singer has suffered severe physical and mental anguish and extreme emotional distress.

286. Plaintiff, Judith Singer, is a citizen of the United States and a resident of the State of New Jersey. Mrs. Singer is the mother of Sarri Anne Singer.

287. Mrs. Singer learned of the attack when her son telephoned her at work.

288. As a result of the attack Judith Singer has suffered severe mental anguish and extreme emotional distress.

289. Plaintiff, Eric M. Singer, is a citizen of the United States and a resident of the State of New Jersey and the brother of Sarri Anne Singer.

290. Eric first learned of the attack when he received an emergency phone call from his father while having lunch in a restaurant. After speaking with his mother and notifying his office, Eric and his father flew that night to Israel to be with Sarri.

291. As a result of the attack, Eric Singer has suffered severe mental anguish and extreme emotional distress.

## SHOOTING ATTACK ON THE TRANS-ISRAEL HIGHWAY: JUNE 17, 2003

### The Leibovitch Family

292. On June 17, 2003, Shlomo and Galit Leibovitch were driving in their car with their four children, Hila (age 16), Moshe (age 11), Noam (age 7) and Shira (age 3). While driving on the highway, terrorists began shooting at the car, killing Noam Leibovitch and injuring her 3-year old sister, plaintiff Shira Leibovitch.

293. One shot hit Noam on her right side and traveled through her body and exited at her left hip. The bullet continued traveling through Shira's wrist and lodged itself in Shira's back, only a few millimeters from her spinal cord.

294. Although the family members tried to resuscitate Noam, she did not survive and was pronounced dead at the scene of the attack.

295. An Islamic Jihad terrorist cell was later apprehended in connection with the attack.

296. Shlomo and Galit Leibovitch are citizens of the State of Israel. They are the parents

of Noam and Shira Leibovitch. Shira Leibovitch is a citizen of the United States.

297. Shira underwent surgery and the bullet was removed from her back and doctors attempted to repair her hand. Shira remained in the hospital for two weeks where she underwent a regimen of physical therapy. She still has significant limitations of movement in her right hand and wrist. She has also undergone an additional subsequent operation to improve the use of her fingers. The surgery was only partially successful. Testing has recently shown that her injured hand is not growing at the same rate as her other hand.

298. As a result of the attack, plaintiff, Shira Leibovitch, has experienced severe physical and mental anguish and extreme emotional distress and has lost her sister's society, companionship, advice and counsel.

299. As a result of the attack, plaintiffs, Shlomo and Galit Leibovitch, have experienced severe mental anguish and extreme emotional distress and have forever lost their daughter's society and companionship.

300. As a result of the attack, Hila Leibovitch, Moshe Leibovitch have experienced severe physical and mental anguish and extreme emotional distress and have lost their sister's society, companionship, advice and counsel.

## THE KFAR DAROM BUS SHOOTING: NOVEMBER 20, 2000

### The Biton Family

301. Gavriel Biton boarded a bus on the morning of November 20, 2000 that transported children to school. Three Palestinian terrorists directly propelled a large bomb, comprised of a 122-mm mortar shell as the bus drove near the Magen Junction in Gaza. Two adults, including Gavriel Biton were killed in the attack. Nine (9) others were injured, including a

46

number of children who lost limbs as a result of the explosion.

302. Plaintiff, Avigail Lewis Biton, is the wife of Gabriel Biton and is a citizen of the United States and of the State of Israel.

303. Plaintiff, Avigail Biton, attempted to contact her husband on his cell phone once she learned of the attack, but had no success. A few hours after the attack members of her community came to her home and informed Avigail that her husband had been killed.

304. As a result of the death of her husband, Avigail Biton has lost the material services, affection, companionship, consortium and the customary amenities of married life and has suffered severe mental anguish and extreme emotional distress.

305. Plaintiffs, Elyashiv Biton, Tamar Biton, Noam Biton, Oriya Biton, Shilo Biton, and Adi Penina Biton, are citizens of the State of Israel. They are the children of plaintiff, Avigail Biton and Gavriel Biton.

306. Each of Avigail and Gavriel Biton's children has lost their father and the benefits of his companionship, comfort, protection, financial support, attention, advice and counsel for the balance of their lives.

307. As a result of the death of their father, Elyashiv Biton, Tamar Biton, Noam Biton, Oriya Biton, Shilo Biton, and Adi Penina Biton have suffered severe mental anguish and extreme emotional distress.

**The Assraf Family**

308. Plaintiff, Rachel Assraf, is a citizen of the United States and a citizen and resident of the State of Israel. Plaintiff Eli Assraf is a citizen of the State of Israel. He is the husband of Rachel Assraf.

309. On the morning of November 20, 2000, Rachel Assraf was a passenger on the Kfar

Darom bus and was 12 weeks pregnant at the time.

310.  After the explosion, Rachel lost her hearing and she felt a surge of heat on her back. The bus continued to move and came to a stop at a military base. Rachel saw that her friend's head had been partially severed as a result of the explosion. She also saw children she knew on the floor of the bus in a tangle of missing limbs.

311.  As the bus continued on the road Rachel was able to telephone her husband, Plaintiff Eli Assraf, and let him know that she had been in an attack.  Upon arrival at the military base Rachel had to exit the bus, stepping over victims' bodies and limbs, including her friend who had been partially decapitated.

312.  Rachel Assraf  sustained severe burns on her back as well as burns and cuts on her hand.  She lost feeling in some of the fingers in her right hand.  In addition to post traumatic stress, Rachel also experienced great anxiety over the health and safety of her unborn child.

313.  Even a month after the attack, Rachel continued to have a numbing sensation in her hand.  She had an additional operation on her hand to remove a piece of metal that was lodged there.  Her hand is scarred and continues to have limited functioning.

314.  For months after the attack Rachel had great difficulty sleeping.  She had frequent nightmares about the health of her unborn child, and would wake up screaming.  She continues to have panic attacks at night.

315.  As a result of the attack, Rachel Assraf has suffered severe physical and mental anguish and extreme emotional distress.

316.  For 17 years prior to the attack, Eli Assraf was in charge of security in Kfar Darom.  He would be among the first individuals on the scene of a terrorist attack to assist with the victims and the emergency personnel.

317. After the attack Eli took a few months off to assist in the care of his wife and attend to the needs of his family.

318. Since the attack, Eli has been unable to return to his work, finding it too difficult emotionally.

319. As a result of the attack and viewing the injuries to his wife and the others whom he knew on the bus, Eli Assraf has suffered severe mental anguish and extreme emotional distress.

320. Plaintiff Moshe Assraf is a citizen of the State of Israel. He is the son of Rachel and Eli Assraf.

321. Moshe has experienced difficulties coping with the attack that resulted in injuries to his mother and others he knew on the bus.

322. As a result of the attack Moshe Assraf has suffered severe mental anguish and extreme emotional distress.


## THE HADERA BAT MITZVAH MASSACRE: JANUARY 17, 2002

### The Ellis/Knox Families

323. Aharon Ben-Yisrael Ellis was a citizen of the United States and of the State of Israel. On January 17, 2002, Aharon Ellis was performing as a singer at a Bat Mitzvah reception at a banquet hall in Hadera. A terrorist named Abd As-Salam Sadeq Hassouna entered the banquet hall and opened fire on the 180 guests with an assault rifle, killing five people including Aharon Ellis.

324. Plaintiff, Leslye Knox, was the common law wife of Aharon Ellis. Leslye Knox is a citizen of the United States and a resident of the State of Georgia. She brings this action both

individually and on behalf of the Estate of Aharon Ben-Yisrael Ellis.

325.   In the middle of the night on January 17-18, 2002, plaintiff Leslye Knox, received a telephone call waking her up and informing her that Aharon had been killed.  She was completely devastated when she learned the news.

326.   Leslye and Aharon had been together for six years prior to the attack.  They had a son together, plaintiff Jordan Terrell Ellis.  Jordan Terrell Ellis is a citizen of the United States and resident of the State of Georgia.

327.   Following the death of Aharon Ellis, Leslye returned to the United States and all but one of her children reside with her in Georgia.

328.   As a result of the death of Aharon Ellis, Leslye Knox has lost material services, affection, companionship, consortium and the customary amenities of married life and suffered severe mental anguish and extreme emotional distress.

329.   As a result of the terrorist attack and his father's murder, Jordan Terrell Ellis will never have a memory of his father and has permanently lost the benefits of his companionship, comfort, protection, attention, advice and counsel for the balance of his life.

330.   As a result of the death of his father, Jordan Terrell Ellis has suffered severe mental anguish and extreme emotional distress.

331.   Plaintiffs, Prince Elkannann Ben Shalcak and Mello Nee Ellis, are United States citizens and residents of Israel. They are the parents of Aharon Ben-Yisrael Ellis. They learned of the attack that killed their son when Prince Elkannann's friend heard the news and went to their home and woke them in the middle of the night. They listened to the radio all night long to confirm the details of the attack.

332.   Plaintiff, Yehonadav Ellis, identified the body of his brother, Aharon, at the

morgue.

333. As a result of the death of their son, plaintiffs Prince Elkannann Ben Shaleak and Mello Nee Ellis have suffered severe mental anguish and extreme emotional distress.

334. Plaintiffs, Francine Ellis, Lynne Ellis, Shemariah Ellis, Tsaphrira Ellis and Yehonadav Ellis are the siblings of Aharon Ben-Yisrael Ellis. They are all citizens of the United States and residents of the State of Israel.

335. As a result of the death of their brother, Francine Ellis, Lynne Ellis, Shemariah Ellis, Tsaphrira Ellis and Yehonadav Ellis have suffered severe mental anguish and extreme emotional distress.

336. Plaintiffs, Reuven Carter, Shanon Carter, Shayrah Carter, Yoshavya Carter, and Amitai Carter, are citizens of the United States. They are the children of plaintiff, Leslye Knox and the step-children of Aharon Ben-Yisrael Ellis.

337. For the six years prior to the attack, Aharon Ben-Yisrael Ellis served as their father.

338. Plaintiffs, Reuven Carter, Shanon Carter, Shayrah Carter, Yoshavya Carter, and Amitai Carter, have permanently lost the benefits of their step-father's companionship, comfort, protection, attention, advice and counsel for the balance of their lives.

339. As a result of the death of their step-father, Reuven Carter, Shanon Carter, Shayrah Carter, Yoshavya Carter, and Amitai Carter have suffered severe mental anguish and extreme emotional distress.

### SHOOTING RAMPAGE AT JERUSALEM BUS STOP: JANUARY 22, 2002

340. On January 22, 2002, at approximately 4:30 p.m. local time in Jerusalem, Sa'id Ibrihim Ramadan, a PLO operative belonging to the Al Aqsa Martyrs Brigades, opened fire at

a crowded bus stop on the corner of Jaffa Street and Lunz Street. He was eventually gunned down by police, but not before killing two bystanders and injuring more than 40 people.

**The Gould Family**

341.  Shayna Eileen Gould is a citizen of the United States and a resident of the State of New York was waiting at the bus stop, talking to her friend on her cell phone when she was shot once in the chest by the gunman.

342.  Although she was initially pronounced dead upon arrival at the hospital they managed to revive her and she underwent surgery and one of her lungs had to be removed. One of her back muscles was removed to save her life. During the operation Shayna's heart stopped. She had lost a great deal of blood. The surgeons were unable to remove all of the bullet fragments because they were too close to vital organs.

343.  Shayna remained in the hospital for two weeks and continued treatment as an outpatient for one month. Subsequent to the initial surgery, Shayna has undergone additional operations to correct complications. Three separate 3-inch gaps in her ribs were removed, and no replacement surgery is available to correct the condition. These gaps are located over her heart, which makes her condition more precarious.

344.  There are still pavement fragment wounds imbedded in Shayna's leg. She continues to suffer from extreme pain. She often has difficulty breathing, especially when there is a change in the weather. The attack has also necessitated extensive meetings with a psychologist.

345.  As a result of the attack Shayna Gould has suffered severe and physical and mental anguish and extreme emotional distress.

346.  Plaintiff, Ronald Allan Gould, is a citizen of the United States and a resident of the

State of Illinois. He is the father of plaintiff Shayna Gould.

347. Mr. Gould received a telephone call from the college in Jerusalem where Shayna Gould was attending classes. Initially, Mr. Gould was informed that his daughter had died at the scene. He subsequently telephoned his wife, plaintiff Elise Gould, and his daughter, plaintiff Jessica Rine. He initially informed the family that Shayna had been injured in an attack, even though he then believed that she was deceased. Plaintiff, Jessica Rine, then organized the family's emergency trip to Israel.

348. Mr. Gould is a professional commercial photographer who was engaged in photographing medical procedures.

349. As a result of the terrorist attack plaintiff, Ronald Gould, is no longer psychologically able to photograph medial procedures and has experienced severe mental anguish and extreme emotional distress.

350. Plaintiff, Elise Gould, is a citizen of the United States and a resident of the State of Illinois. She is the mother of plaintiff Shayna Gould.

351. As a result of the terrorist attack that grievously injured her daughter, Elise Gould has suffered severe mental anguish and extreme emotional distress.

352. Plaintiff, Jessica Rine, is a citizen of the United States and a resident of the State of Illinois. She is the older sister of plaintiff Shayna Gould.

353. As a result of the terrorist attack that grievously injured her sister, Jessica Rine has suffered severe mental anguish and extreme emotional distress.

**Shoshana Zelcer**

354. Plaintiff Shoshana Zelcer is a citizen of the United States and a resident of the State of New York.

355. On January 22, 2001, Shoshana Zelcer was standing at the bus stop on Jaffa Road in Jerusalem with her friend, plaintiff Shayna Gould, when a Palestinian terrorist opened fire with an M-16 automatic rifle. Shoshana was standing under the awning at the bus stop while Shayna was talking on her cell phone.

356. When the shooting began, she crouched down in the bus shelter then ran toward the alley behind the bus stop and found herself standing in front of the terrorist, looking straight at his face. As she began to run away, the terrorist shot her. Shoshana initially felt pain in her left thigh because a bullet had ricocheted off the pavement and lodged itself in her lower back, knocking Shoshana to the ground. Shoshana was also hit by shrapnel all over her body, including some that injured her Achilles tendon.

357. Shoshana was sent by ambulance to the hospital where she underwent x-rays and waited as the area around the bullet was irrigated for hours. Eventually, the bullet was removed. However, there was too much shrapnel to remove it all from her body.

358. As a result of the injury to her Achilles tendon, Shoshana was immobile for a week. She was still experiencing severe pain and was unable to get out of bed. As time passed, she was gradually able to regain strength in her leg; however, she still is incapable of running due to the pain and fear that the injury will worsen.

359. Apart from her physical injures, Shoshana has experienced extreme psychological trauma and has been diagnosed with post traumatic stress disorder. She continues to have nightmares and was treated by a therapist for over two years.

360. As a result of the attack, Shoshana Zelcer has suffered severe physical and mental anguish and extreme emotional distress.

## The Waldman Family

361. Shmuel Waldman is a citizen of the United States and the State of New Jersey.

362. On January 22, 2002, as Shmuel Waldman boarded a bus in Jerusalem when a Palestinian terrorist opened fire with an M-16 automatic rifle. He was shot twice in his leg at point blank range, rupturing his leg.

363. He immediately telephoned his wife to inform her of the attack and his condition.

364. Two women were killed in the attack, and over 40 were injured. The perpetrator of the attack was killed at the scene.

365. Shmuel has undergone a number of operations to repair the injuries to his leg. Due to the extensive nerve damage to his leg, Shmuel has little sensation in his right leg. For over three years Shmuel has attended therapy sessions. As a result of the traumatic experience of the attack, Shmuel felt he could no longer reside in Israel and has relocated to New Jersey.

366. As a result of the attack, Shmuel Waldman has suffered severe physical and mental anguish and extreme emotional distress.

367. Plaintiff, Henna Novack Waldman, is a citizen of the United States and a resident of New Jersey as well as a citizen of the State of Israel.

368. After the attack, Henna met her husband at the hospital and found him in extreme pain.

369. As a result of the attack Henna Waldman has suffered severe mental anguish and extreme emotional distress.

370. Plaintiffs Morris Waldman and Eva Waldman are citizens of the United States and residents of New York. They are the parents of plaintiff Shmuel Waldman.

371. While on route to the hospital to visit his father, Morris Waldman received a

telephone call from his daughter informing him that Shmuel had been shot. Morris then telephoned his wife, Eva, to inform her.

372. By 6:00pm that evening, Morris was on a plane to visit his son in Israel. When he arrived, he found his son's leg very swollen and saw his son experiencing great pain. Morris closed his business for two weeks to stay in Israel with his son.

373. Morris continues to experience fear when ever he hears of any type of terrorist attack in Israel.

374. As a result of the attack, Morris and Eva Waldman have suffered severe mental anguish and extreme emotional distress.

375. Plaintiff Chanie Bodenstein is a citizen of the United States. She currently resides in the State of Israel. She is the older sister of Shmuel Waldman.

376. On the evening of the attack, Chanie heard sirens and emergency vehicles heading to the area where her brother worked. She attempted to contact him by telephone, but received no answer on his cellular telephone. Finally, she learned that he was in the hospital and had been shot.

377. She visited her brother the following day, finding him in excruciating pain, extremely pale, and his leg incredibly swollen.

378. Since the attack Chanie Bodenstein has become very nervous and will no longer go to crowded areas and becomes very anxious when she is near a bus stop.

379. As a result of the attack Chanie Bodenstein has suffered severe mental anguish and extreme emotional distress.

380. Plaintiff Shaindy Weinberger is a citizen of the United States. She currently resides in the State of Israel. She is the younger sister of Shmuel Waldman.

381. As a result of the attack Shaindy Weinberger has suffered severe mental anguish and extreme emotional distress.

382. Plaintiff Philip Waldman is a citizen of the United States and is a resident of the State of New York. He is the younger brother of Shmuel Waldman.

383. Philip and Shmuel are very close brothers. Each time there is another terrorist attack in Israel, Philip again experiences the distress and anxiety he experience when he first learned of the attack that injured his brother.

384. As a result of the attack Philip Waldman has suffered severe mental anguish and extreme emotional distress.

385. Plaintiffs Abraham Waldman and Dassie Waldman are citizens of the United States and residents of the State of New York. Abraham and Dassie Waldman are the younger siblings of plaintiff Shmuel Waldman.

386. As a result of the attack, Abraham Waldman and Dassie Waldman have suffered severe mental anguish and extreme emotional distress.

## SHOOTING ATTACK IN GIVAT ZEEV: JANUARY 8, 2001

### The Guetta Family

387. Oz Joseph Guetta is a citizen of the United States and of the State of Israel. He is currently 16 years old.

388. Varda Guetta is a citizen of the State of Israel. She is the mother of plaintiff Oz Joseph Guetta.

389. On January 8, 2001 Oz was in a car with his mother, Varda Guetta, having dropped one of Oz's friends off at his home. While returning to their home they stopped at a

stop sign in Givat Zeev. While waiting at the stop sign four men drove their car alongside Varda and Oz's car and began shooting at the car. Nineteen (19) bullets hit the car.

390. One shot damaged the engine of the car so Varda was unable to move the car from the scene.

391. Two bullets hit Oz in his left hand. Another struck him in the left foot. Bullet fragments remained in his hand.

392. Oz was taken to the hospital by ambulance, and upon arrival he was taken to the trauma room. He was x-rayed and it was determined that a shot had broken his elbow. He was placed in a cast. While in the hospital he had an infection and endured fevers. He remained in the hospital for ten days.

393. After returning home he had significant problems with his hands; he was unable to move his fingers or hand. He underwent surgery removing nerve from his leg and transplanting it into his hand, and he remained in the hospital for eight days. Although the surgery improved his hand movement somewhat he has developed numbness in his leg. He was an exceptional soccer player, and he is unable to play this or any sports he used to play prior to the attack.

394. For over 10 months after the accident Oz required physical therapy five days each week.

395. He continues to have difficulty sleeping every night. He has nightmares and wakes up screaming. He will not travel unaccompanied.

396. Varda also has become very fearful. She and Oz do not go out at night. They do not even attend family events if they occur at night. Since the shooting Varda has not worked, for she must take Oz to and from school since he will not travel alone or on a bus.

397.  As a result of the attack plaintiff Varda Guetta and Oz Joseph Guetta have suffered severe physical and mental anguish and extreme emotional distress.

398.  Sara Guetta Kleitman is a citizen of the United States and of the State of Israel. She is a resident of the State of Florida. She is the daughter of Varda Guetta and the sister of Oz Joseph Guetta.

399.  Sara first learned of the attack when her mother telephoned her. A neighbor brought Sara to the site of the attack and she accompanied her mother and brother to the hospital by ambulance. Sara experienced first-hand the extent of the injuries to her brother and witnessed the numerous bullet holes in her family's car.

400.  In addition to watching her brother undergo surgeries and physical recovery from his injuries, Sara has painfully witnessed the psychological trauma that has affected her brother and radically altered his behavior and mental state. She has been unable to cope with the changes in her brother's behavior and no longer resides at home.

401.  As a result of the attack, Sara Guetta Kleitman has experienced severe mental anguish and extreme emotional distress.


## THE BUS STOP SUICIDE BOMBING AT THE FRENCH HILL: JUNE 19, 2002

### The Mandelkorn Family

402.  Rabbi Leonard Mandelkorn is a citizen of the United States and of the State of Israel. He is the father of Shaul Mandelkorn. Shaul Mandelkorn is a citizen of the State of Israel. Nurit Mandelkorn is a citizen of the State of Israel, and is the mother of Shaul Mandelkorn and the wife of Leonard Mandelkorn.

403. On June 19, 2002, Shaul Mandelkorn exited a bus after returning from a school trip to the Golan Heights. After he got off the bus he headed toward the bus stop just as a suicide bomber detonated his explosives.

404. As a result of the explosion, Shaul was thrown down and covered in blood and shrapnel. He sustained a serious injury to the artery of his right arm. He was hit by shrapnel over his left eye and sustained a hole in his right leg. He also suffered from hearing loss.

405. He was taken to the hospital and underwent operations to address his varied injuries. He also had surgery to determine if he had sustained internal injuries as a result of the blast and it was soon discovered that his lungs had been injured from the blast. Shaul gained consciousness two days after the attack. He underwent physical therapy and received special treatment for his lung injuries.

406. Doctors discovered blood in the retina of his left eye greatly limiting the eye's ability to function properly. He continues to be unable to focus accurately in that eye. Shaul remained in the hospital for 40 days. He continued physical therapy after being released.

407. Six months after the attack additional shrapnel was found in his right eye. He underwent high-risk surgery in that eye. Although the shrapnel was removed, it remains unclear whether or not difficulties will develop with that eye in the future.

408. More recently Shaul has begun remembering more about the attack, resulting in additional psychological trauma. He continues to receive therapy for the anxieties he experiences as a result of the attack.

409. Sometime after 8:00pm on the night of the attack Mrs. Mandelkorn informed Rabbi Mandelkorn that their neighbor's son was missing after the bombing. While assisting the neighbor, Rabbi Mandelkorn received word that Shaul's name had appeared on a list at the

hospital among those injured. Rabbi and Mrs. Mandelkorn drove to the hospital in Jerusalem where they learned that Shaul was in surgery. At that time they learned the extent of Shaul's injuries.

410. As a result of the attack that injured their son, Rabbi Leonard Mandelkorn and Nurit Mandelkorn have experienced severe mental anguish and extreme emotional distress.

**The Kessler Family**

411. Gila Sara Kessler was a citizen of the State of Israel.

412. On June, 19, 2002, the 19-year old was waiting at the bus stop when the suicide bomber detonated his explosives. As a result of the explosion, Gila sustained severe damage to her brain. However, she was still breathing as she was placed in the ambulance to the hospital.

413. Gila was pronounced dead upon arrival at the hospital, and despite the doctors' attempts to massage her heart, she never regained consciousness and died as a result of the attack.

414. Plaintiff Ezra Kessler is the father of Gila Kessler and United States citizen and resident of New York.

415. As a result of the death of his beloved daughter, plaintiff Ezra Kessler has suffered severe mental anguish and extreme emotional distress

416. Plaintiff Chana B. Kessler is a citizen of the United States and a citizen and resident of the State of Israel. She is the 16-year old younger sister of Gila Sara Kessler.

417. Plaintiff Fortouna Brigitte Kessler is a citizen and resident of the State of Israel. She is the mother of Gila Kessler, and the mother and legal guardian of Chana Kessler.

418. Earlier in the evening of the attack, Mrs. Kessler spoke with Gila and discussed her daughter's plans to come home later that evening. Mrs. Kessler was home at the time with Chana and her other children.

419. Prior to the attack, Gila telephoned her mother from the bus stop. Within a few minutes after the attack, Mrs. Kessler received a telephone call from one of Gila's friends, informing her of the attack, and inquiring as to Gila's whereabouts. Mrs. Kessler attempted to contact Gila, but there was no answer on her cell phone. Mrs. Kessler tried to contact Gila's employer at work, but received no information.

420. Eventually, Mrs. Kessler learned the hospital where Gila had been taken. She identified her daughter's body by looking at her hands, but was advised not to look at her daughter's face because of the disfigurement caused by the explosion. Gila's uncle and her employer also identified the body. Gila's identity was ultimately confirmed through a blood test.

421. As a result of the death of her beloved daughter, plaintiff Fortouna Brigitte Kessler has suffered severe mental anguish and extreme emotional distress

422. Plaintiff Shalom Kessler is a citizen of the State of Israel and is the brother of Gila Kessler. Plaintiff Klila Kessler is a citizen of the State of Israel and is the younger sister of Gila Kessler.

423. On the evening of the attack, Chana, Shalom and Klila were home with their mother. They knew there had been an attack, and were told their mother was going to the hospital to check on Gila's condition. When their mother returned, Mrs. Kessler informed their children that Gila had been killed in the attack.

424. As a result of the death of their sister, plaintiffs Chana Kessler, Shalom Kessler and Klila Kessler have suffered emotional pain and suffering, loss of companionship, comfort, advice and severe mental anguish and extreme emotional distress.

## THE JERUSALEM BOMBING OF JANUARY 27, 2002

### The Sokolow Family

425. Plaintiff Mark I. Sokolow and Rena M. Sokolow are United States citizens and residents of the State of New York.

426. They were vacationing in Israel where their oldest daughter was spending a year in school. On the last day of their trip, Sunday, January 27, 2002, the Sokolows together with their two younger daughters, Plaintiff Jamie A. Sokolow and Plaintiff Lauren M. Sokolow walked to a shoe store not far from their hotel. Upon existing the store, they were knocked to the ground by a bomb blast. Wafa Ali Khalil Idris, a female suicide bomber dispatched by the PLO had detonated her explosive belt. Ms. Idris was the first female suicide bomber of the Second Intifada.

427. According to the leading Palestinian newspaper *Al Quds* (March 1, 2002):

> "Senior officials in the Fatah Movement [PLO] have said that the Shahid Brigades of Al-Aqsa…" has recently created a woman's brigade, in order for women to take an active part in the war being fought in the Palestinian areas. The purpose of this brigade is to carry out attacks on the Israeli home front. The troop has been named "the brigade in honor of the Martyr Wafa Idris."

428. In addition to inspiring a popular song and a children's book published in Egypt, after the suicide bombing Wafa Idris became a household name within the Palestinian media and a perverse "feminist" icon and role model for future female terrorists. Wafa Idris's family received its payment from the Saudi Committee in the form of twenty thousand (20,000) Riyals converted into five thousand three hundred and sixteen dollars and sixteen cents

($5,316.16). The amount was paid to the family's Arab Bank account and designated with Receipt of Transfer No. 2195593712.

429. After the blast, Plaintiff Mark I. Sokolow gathered himself and began looking for his wife and children. Eventually, he walked to the nearby hospital where he was treated for shrapnel injuries and released the following day. As a result of the blast, Mr. Sokolow sustained damage to his eardrum and a loss of hearing. He had to have follow up surgery for a burst eardrum and still experiences ringing in his ears.

430. After the blast, Plaintiff Rena M. Sokolow gathered herself mentally and began looking around for her husband and children and saw instead, the severed head of Wafa Idris. Mrs. Sokolow could not move because of the severe injury to her leg and the agonizing pain. She was hospitalized for ten (10) days and required extensive surgery to be able to walk again. It took five months for Mrs. Sokolow to walk again and a year of physical therapy to regain partial movement in her leg. Rena Sokolow still cannot move her toes or ankle fully and experiences permanent nerve damage and numbness in parts of her leg.

431. Plaintiff Jamie A. Sokolow was twelve year old U.S. citizen at the time of the attack. She was hospitalized for a week with shrapnel wounds to her face and eye. Jamie sustained a torn iris and had surgery to remove glass from her eye. She also underwent plastic surgery to repair her face, but she still retains facial scarring from the blast.

432. Plaintiff Lauren M. Sokolow was a sixteen year old U.S. citizen at the time of the attack. She was hospitalized for three days with shrapnel wounds and burns and lost some of hearing as a result of a burst eardrum. Lauren also has permanent scars on her face and legs and had to have additional surgery to repair her hearing.

433. As a result of the attack plaintiffs Mark I. Sokolow, Rena M. Sokolow, Lauren M. Sokolow and Jamie A. Sokolow have suffered severe physical and mental anguish and extreme emotional distress.

434. Plaintiff Elana R. Sokolow is the daughter of Mark and Rena Sokolow and the sister of Jamie and Lauren Sokolow. As a result of the attack plaintiff Elana R. Sokolow has suffered severe mental anguish and extreme emotional distress.

## MURDER AT THE NATIONAL INSURANCE INSTITUTE: OCTOBER 30, 2000
### The Gilmore Family

435. On October 30, 2000, shortly after noon, a man entered the offices of the National Insurance Institute on Asfani Street in the heart of eastern Jerusalem. From close range, he fired a number of shots at the two security guards seated in the first floor waiting room, hitting them in the head, chest, and abdomen. The assailant then fled. The security guards received initial treatment from a doctor from an adjacent clinic before an ambulance arrived and rushed them to Hadassah-University Hospital, Ein Kerem. One of the security guards, Esh Kodesh Gilmore, a U.S. citizen, died almost immediately upon arrival at the hospital. His estate brings this action to recover for his wrongful death and his pain and suffering.

436. Plaintiffs Reuven Gilmore and Sheila Gilmore are the parents of Esh Kodesh Gilmore and the Administrators of the estate of their son's estate. Plaintiffs Reuven Gilmore and Sheila Gilmore are citizens of the United States and citizens and residents of the State of Israel. As a result of the death of their son, they have both suffered severe mental anguish and extreme emotional distress.

437. Plaintiff Inbal Gilmore Ratz is a citizen and resident of the State of Israel. She

learned of her husband's death from a phone call. As a result of the murder of her husband, Inbal lost material services, affection, companionship, consortium and the customary amenities of married life.

438.  Plaintiff Talya Gilmore was a year and half old when her father was murdered. As a result of the terrorist attack and her father's murder, she will never have any memory of her father and has permanently lost the benefits of his companionship, comfort, protection, attention, advice and counsel for the balance of her life.

439.  Plaintiffs Malkitzedek Gilmore, Tiferet Gilmore, Heftziba Gilmore, Eliana Gilmore and Dror Gilmore are the siblings of Esh Kodesh Gilmore and are all citizens of the United States and citizens and residents of the State of Israel. As a result of the attack, they have all suffered severe mental anguish and extreme emotional distress.

## THE BOMBING OF BUS NUMBER 19: JANUARY 29, 2004

### The Goldberg Family

440.  On January 29, 2004 Ali Ja'ara, a member of the Al-Aksa Martyrs Brigades from the Aida refugee camp on the outskirts of Bethlehem blew himself up on a Jerusalem bus, killing 11 people and wounding 50 others.

441.  Stuart Scott Goldberg, 41, a Canadian from Toronto was one of the fatalities. He is survived by his wife and seven children. Mr. Goldberg was a therapist who specialized in helping teens at risk and their families.

442.  Plaintiff Karen Goldberg is a citizen of the United States and citizen and resident of the State of Israel. As a result of her husband's death she has lost material services, affection, companionship, consortium and the customary amenities of married life. As a result

of the attack, she has suffered severe mental anguish and extreme emotional distress.

443. As a result of the terrorist attack and their father's murder, Stuart and Karen's seven children, plaintiffs Chana Goldberg, Esther Goldberg, Yitzchak Goldberg, Shoshana Goldberg, Eliezer Goldberg, Yaakov Moshe Goldberg and Tzvi Ychoshua Goldberg have permanently lost the benefits of his companionship, comfort, protection, attention, advice and counsel for the balance of their lives. As a result of the attack, they have all suffered severe mental anguish and extreme emotional distress.

## PASSOVER MASSACRE AT THE PARK HOTEL: MARCH 27, 2002

### The Rogen Family

444. On March 27, 2002 a HAMAS suicide bomber blew himself up near the dining area within the Park Hotel in Netanya. It was the night of the Jewish holiday of Passover and the hotel dining room was filled with hundreds of people celebrating the Passover Seder with their families and friends. Thirty (30) people were murdered in the bombing, including Hannah Rogen, who was severely wounded. She died of her wounds six days later, on April 2, 2002. Mrs. Rogen was a Holocaust survivor who emigrated to the United States after World War II. She was attending the Passover Seder at the invitation of a childhood friend, Yulia Talmi, who was also killed in the attack.

445. Mrs. Rogen was a U.S. citizen at the time of her death.

446. Plaintiff Greta Geler is the great niece of Mrs. Rogen and the Administrator of her estate.

## THE SHEFFIELD CLUB BOMBING OF MAY 7, 2002

447. On the night of May 7, 2002 a Palestinian suicide bomber entered the third floor

of a building in Rishon Letzion's new industrial area which housed the Sheffield Club an unlicensed social club and gambling parlor.

448.    Eyewitnesses reported that bomb blast propelled many of the victims through the club's windows and on to parked cars in the parking lot three floors below.

449.    Fifteen (15) people were killed by the attack including Esther Bablar, an American citizen who had returned to Israel after thirty (30) years to marry her childhood sweetheart, Yitzhak, who was also murdered in the attack. Esther Bablar died of her injuries the following morning. Mrs. Bablar was survived by three children.

### The Bablar Family

450.    Plaintiffs Jacqueline Chambers and Levana Cohen Harooch are citizens of the United States and residents of the State of Florida. They are the daughters of Esther Bablar.

451.    Plaintiff Jacqueline Chambers brings this action both individually and on behalf of the Estate of Esther Bablar.

452.    Mrs. Bablar had spent the month before the bombing in Florida with her youngest daughter, plaintiff Levana Cohen Harooch who had just given birth to Mrs. Bablar's grandchild and had been in New York visiting plaintiff Jacqueline Chambers the day before the attack.

453.    On the day of the attack, a member of the Bablar family in Israel contacted Esther Bablar's sister in New York and told her the bad news. Eventually both of Mrs. Bablar's daughters were notified and they quickly made arrangements to board a flight to Israel with their aunt and uncle.

454.    As a result of the terrorist attack, plaintiffs Jacqueline Chambers and Levana Cohen Harooch have experienced emotional pain and suffering, the loss of their mother's

society, companionship, comfort, protection, attention, advice and counsel.

## PATT JUNCTION BUS # 32A BOMBING: JUNE 18, 2002

### The Aluf Family

455. At approximately 7:50 a.m. on June 18, 2002, a HAMAS terrorist named Mohammed al-Ghoul boarded bus number 32A from the Gilo neighborhood of Jerusalem and almost immediately detonated the large bomb which he carried in a bag stuffed with ball bearings. The blast destroyed the front half of the bus, packed with people on their way to work and a group of schoolchildren. HAMAS claimed responsibility for the attack and identified the bomber, Mohammed al-Ghoul as an Islamic law student at An-Najah University. His father later told the British Broadcasting Company that his son was "a quiet person and very polite - but God chose him for that act. God will put him in paradise."

456. Plaintiff Gila Aluf is a U.S. citizen and a citizen and resident of the State of Israel. Her husband, Boaz Aluf, a citizen of the State of Israel, was going to work in the computer department of Jerusalem's Bank Tefahot when Muhamed al-Ral blew himself up on the morning of June 18, 2002, killing Boaz Aluf.

457. Gila and Boaz Aluf have five children, plaintiff Yifat Aluf, Uri Aluf, Tamar Aluf, Barak Aluf and Ruth Aluf – all of whom are Israeli citizens.

458. As a result of the terrorist attack that murdered Boaz Aluf, plaintiff Gila Aluf has lost the material services, affection, companionship, consortium and the customary amenities of married life and has suffered severe mental anguish and extreme emotional distress. Plaintiffs Yifat Aluf, Uri Aluf, Tamar Aluf, Barak Aluf and Ruth Aluf have suffered severe mental anguish and extreme emotional distress.

**B.     The Defendant**

459.  Defendant Arab Bank is Jordanian bank with headquarters in Amman, Jordan, the common stock of which is publicly traded on the Amman Stock Exchange.  Arab Bank is majority owned and controlled by the shareholders of Arab Bank Group, a Jordanian holding company.  Arab Bank and Arab Bank Group constitute a single Jordanian banking institution.  Arab Bank owns, controls and/or operates bank branches worldwide, including several branches that are situated in Palestinian Authority controlled territories and a wholly owned branch office located at 520 Madison Avenue, New York, New York, that is regulated by the Controller of the Currency of the United States Treasury Department.  Arab Bank conducts business in, and is registered to conduct business under, the laws of the state of New York.

460.  Arab Bank has operated its federally chartered branch in New York since 1983.  The New York branch is designated as a wholesale bank, and among the banking and financial services that it conducts in New York is the provision of clearing and correspondent bank services to its foreign bank branch offices and affiliated banking institutions that are also owned and/or controlled by the Arab Bank Group as well as other foreign banks.

461.  Arab Bank and Arab Bank Group are majority owned and/or controlled by members of the Shoman family, including Abdul Majeed A.H. Shoman, who is the Chairman of Arab Bank and Arab Bank Group, Abdel Hamid A.M. Shoman, who is Deputy Chairman and Chief Executive Officer of Arab Bank and Arab Bank Group.

## FACTUAL ALLEGATIONS

### The Al Aqsa Intifada or Intifada Al Quds

462. Following the collapse of the peace negotiations at the presidential retreat at Camp David in the summer of 2000, Palestinian terror organizations launched a broad-based terror campaign against the State of Israel at the end of September 2000.

463. This explosion of violence was widely termed the so-called *Al Aqsa Intifada* or *Intifada Al Quds* (Hereinafter: "Second Intifada").

464. This Second Intifada was both qualitatively and quantitatively different from prior waves of Palestinian terrorism.

465. Whereas the total number of attacks from 1993-2000 totaled less than 1,000, since September 2000 various Palestinian terrorists have attempted approximately 23,000 attacks, which have claimed more than 8,000 casualties, including over 1,000 civilian deaths. These indiscriminate acts of violence have likewise resulted in the deaths of at least 30 U.S. citizens and caused serious bodily injury to scores of others.

466. The preferred method of mass murder used by Palestinian terrorist groups is the suicide bombing which involves an individual carrying an explosive device which he or she detonates in a bus, restaurant or other crowded public gathering place.

467. The device is typically packed with nails, bolts and ball bearings, which, when detonated, lodge themselves deep within the bodies of those unfortunate individuals who happen to be inside the blast radius, causing cruel and horrific injuries. The suicide bomber is thereby regarded as a "martyr" (or "Shahid" in Arabic) by the terrorist groups and their sympathizers.

468. In fact, because many suicide bombers are stopped and killed before they can

successfully detonate their explosive charges and others have died as a result of premature or accidental detonations, the term "martyr" has generally been used by these organizations to include both suicide bombers and all others killed in the course of attempts to commit acts of violence against Israeli or Western targets.

469. The objectives of the Al Aqsa Intifada terror campaign include intimidating and coercing the civilian population of Israel and attempting to influence the policy of the Israeli government by compelling Israel to withdraw from territory it presently controls.

470. The eruption of the Al Aqsa Intifada in late September 2000 changed the dynamics of Palestinian terrorism in four material respects:

        A.     The Second Intifada, from its inception, was marked by a massive escalation of violence, which quickly transformed the tactics of the Islamist terrorist groups from the margins to the mainstream of Palestinian politics.

        B.     The unrestrained violence of the Second Intifada and the increasing credibility and prestige it provided for the Islamist groups forced other (secular) Palestinian terrorist groups to adopt Islamist rhetoric and tactics.

        C.     The main rival terrorist groups began cooperating and coordinating their activities.

        D.     The Second Intifada coalesced Saudi financial support for HAMAS into a more ambitious and more formal structure through the formation of the Saudi Committee in Support of the Intifada Al Quds.

**The Primary Palestinian Terrorist Groups**

471. Several prominent terrorist organizations operate in Palestinian-controlled territory, most notably the Palestinian Islamic Jihad (the "PIJ") and the Islamic Resistance Movement ("HAMAS"). PIJ and HAMAS are both primarily radical Islamist terrorist organizations that are committed to the globalization of Islam through violent "Jihad" or holy

war.

472. Both groups are formally committed to the destruction of the State of Israel and to achieving their objectives by violent means, including acts of terrorism. The HAMAS Charter states that the very purpose of HAMAS is to create an Islamic Palestinian state throughout Israel by eliminating the State of Israel through violent jihad.

473. In addition, the nominal proto-government within Palestinian-controlled territory known as the Palestinian Authority ("PA") operates several paramilitary organizations through its political organization, the Palestinian Liberation Organization ("PLO"). Through the PLO's various permutations, including its "security services", the Palestinian Authority has competed with PIJ and HAMAS to commit terrorist attacks against civilian targets in Israel, including attacks that have killed and injured United States citizens including Shayna Gould, Shoshana Zelcer and Shmuel Waldman.

**The Palestinian Islamic Jihad**

474. The PIJ knowingly, willfully, and unlawfully combines, conspires, confederates, and agrees together to commit numerous acts of international terrorism and other related criminal activity, including murder, attempted murder, solicitation to commit murder and providing material support to Foreign Terrorist Organizations in violation of the federal criminal code of the United States.

475. For example, the organization has committed numerous terrorist attacks, including several that have killed and injured American citizens. Since September 2000, the PIJ has conducted and taken credit for at least 28 murderous attacks, including at least seven mass murder atatcks that have killed at least ninety five (95) civilians, including U.S. citizens such as Shoshana Ben-Yishai.

73

476. On October 8, 1997, the PIJ was designated as a Foreign Terrorist Organization by the U.S. government under the AEDPA. The designation has since been renewed every two years, including in 2003.

### The Islamic Resistance Movement (HAMAS)

477. HAMAS is an acronym for "Harakat al-Muqawama al-Islamiyya," the Islamic Resistance Movement, which was founded in December 1987.

478. The organization is nominally divided into two separate wings, the political wing which supports the so-called "Dawa" (its social service or humanitarian component) and the paramilitary wing known as the Izz-el-Din al Qassam Brigades. Although these two components have separate responsibilities, the organization operates seamlessly, with each component working to conduct the operations and achieve the illegal objectives of the terrorist group as a whole.

479. HAMAS' social services are, in large part, administered by local "zakat," committees and other charitable organizations ("Zakat" means charity in Arabic). These committees and organizations are controlled by HAMAS by, inter alia, HAMAS members, operatives and activists sitting as members of their governing committees.

480. Due to the substantial expenditures of the HAMAS organization and the fungible nature of money, significant sums of monies collected externally under charitable and humanitarian banners are routed for HAMAS' military and other operational uses, in addition to being used to free up other funds for specific terrorists acts. HAMAS uses such funds for, among other things, the provision of weapons, explosives, transportation services, safehouses, training and salaries for its terrorist operatives and for terrorist recruiters.

481. Like PIJ, HAMAS is a foreign organization dedicated to radical Islamist principles

74

and the destruction of the State of Israel. It also uses violence, principally suicide bombings, and threats of violence to pressure Israel to cede territory to the Palestinian people.

482. HAMAS knowingly, willfully, and unlawfully combines, conspires, confederates and agrees to commit numerous acts of international terrorism and other related criminal activity, including murder, attempted murder, solicitation to commit murder and numerous other acts of international terrorism activities as defined by 18 U.S.C. § 1331 and 18 U.S.C. § 2332 and other related acts of murder, attempted murder, solicitation to commit murder and providing material support to designated Foreign Terrorist Organizations in violation of the federal criminal code of the United States.

483. On January 25, 1995, HAMAS was designated as a Specially Designated Terrorist and, on October 8, 1997, by publication in the Federal Register, the United States Secretary of State designated HAMAS as a Foreign Terrorist Organization pursuant to Section 219 of the Immigration and Nationality Act (the "INA") and the AEDPA. The formal designation has been renewed every two years since 1997, including a renewal in August 2003.

484. Since September 2000, HAMAS has launched hundreds of attacks targeting civilians that have resulted in the deaths and injury of hundreds of individuals, including over twenty (20) mass murders that have killed more than three hundred and seventy (370) civilians, including numerous American citizens. HAMAS has claimed responsibility for the attacks that killed Janis R. Coulter, Benjamin Blutstein, Diane Carter, David Gritz, Judith Greenbaum, Hannah Rogen, Alan Beer and several other plaintiffs in this action.

### The Al Aqsa Martyrs Brigade and Other PLO Militia

485. The PA and PLO controlled terrorist groups include, the Tanzim, Popular Front for the Liberation of Palestine ("PFLP") and the Al Aqsa Martyrs Brigade ("AAMB").

486. Tanzim is the armed component of Fatah, which is one of the constituent political groups of the PLO. AAMB is a nom de guerre used by cells of the Tanzim.

487. The PFLP is another constituent group of the PLO, which conducts both its terrorist activities and its political activities in its own name.

488. While these groups are organizationally part of the PLO, their weapons, traning and funding is provided by the PA, and many of their members serve in PA security and intelligence forces. The groups carry out terrorist attacks pursuant to the instructions of both the PLO and the PA.

489. Tanzim, PLFP and AAMB's political lineage is therefore secular and not Islamist in orientation, but since at least September 2000 these PLO and PA controlled groups have adopted both the religious rhetoric of their radical Islamist counterparts and their murderous tactics.

490. The Al Aqsa Martyrs Brigade emerged at the outset of the Second Intifada. AAMB knowingly, willfully, and unlawfully combines, conspires, confederates and agrees together to commit numerous acts of international terrorism and other related criminal activity, including murder, attempted murder, solicitation to commit murder and providing material support to Foreign Terrorist Organizations in violation of the federal criminal code of the United States.

491. For example, the organization has committed numerous terrorist attacks, including several that have killed and injured Americans citizens. Since September 2000, AAMB has conducted and taken credit for dozens of murderous attacks, including a pair of January 2003 suicide bombings in downtown Tel Aviv that killed 23 people and injured approximately a hundred others and a string of other attacks that have killed more than 70 civilians and

wounded more than five hundred (500) others, including U.S. citizens such as plaintiff Yonatan Bauer.

492.    On March 21, 2002, the Secretary of State of the United States officially designated AAMB as a Foreign Terrorist Organization pursuant to Section 219 of the INA and the AEDPA.

## The Conspiracy to Finance Palestinian Terrorism

### The Shoman Family

493. In 1984, the Shoman family that owns and controls Arab Bank Plc published a biography of Mr. Abdulhameed Shoman (the bank's founder) entitled, The Indomitable Arab in which he consistently set forth his antipathy towards Jews, Zionists and the State of Israel. He also clearly describes his abhorrence for the United States, which he claimed to have once admired, but then loathed because of its support for Israel.

494. Prior to the establishment of Arab Bank, its founder Abdulhameed Shoman described his great anger toward Zionists, Jews, and others whom he believed stood in the way of the growth of the Arab economy. In his biography he is quoted as saying that "...within a few years Zionism will have grown strong enough to control the entire economy. I believe that all business dealings with the Jews – buying, selling or banking transactions – are damaging to our country's best interests."

495. In his final speech before four hundred employees of Arab Bank, Mr. Shoman also explained his hatred for Americans that had developed over the years:

> I liked the Americans. I once bore their nationality, and gathered my fortune in their country. But since they started to help the Zionists and supply them with arms to fight us, I have come to detest them. It was not the Jews, but the Americans, who fought us.

496. Mr. Shoman's son, Abd Majeed Shoman is presently the chairman of the Arab Bank and a vocal supporter of the Second Intifada.

497. He is, for example, the chairman of the Popular Committee in Support of the Palestinian Intifada which was established during the first Intifada in 1987-1988. The Committee managed to raise approximately eight millions Jordanian Dinar (JOD 8,000,000) or approximately $11,000,000 for "martyrs' families," paying 1,000 JOD ($1,400) to each martyr's family and 300 JOD ($425) to each Palestinian injured in the violence. From 1995 to 2000, the Popular Committee raised an additional 1,200,000 JOD for the martyrs' families of the first Intifada.

498. At an October, 2000 meeting , the committee's chairman, Mr. Abd Majeed Shoman, and the its other members discussed the need for a new mechanism to distribute the new donations to the Second Intifada which had not yet been transferred to the martyrs' families and the injured of the Intifada as of that date.

499. They decided to bestow financial support to the martyrs' families on the same terms as before and to call upon the Jordanian government to make the donations tax-exempt. The committee's chairman, Abd Majeed Shoman, the Chairman of the Arab Bank, opened the meeting saying:

> After the blessed Intifada [erupted] I thought that we should discuss what to do about it. There are some organizations which are fundraising donations including the Welfare Association [headed by Mr. Shoman]. The Welfare Association received donations and it has funds. I received phone calls and donations from benevolent people and the Arab Bank's board and bank's employees decided to donate 5% from October's salaries [for the Intifada]. In spite of the fact that donations were collected and are available nothing was transferred to anybody. It is our duty to act and therefore I summoned this meeting to hear from you.

500. Mr. Shoman objected to locating the committee's office in the Arab Bank's Amman headquarters building but he left open the possibility of "loaning" an accountant to

the committee.

501. Ultimately, it was decided that the committee's office would be located in the Amman Chamber of Industry headquarters where it in fact opened on November 1, 2000.

502. As referenced by Mr. Shoman in his speech, on or about October 7, 2000, the Arab Bank announced that it would bestow financial donations to Palestinians injured during the Second Intifada. Its employees donated 5% of their monthly salary (for the month) to the Palestinian cause.

503. All of this activity was conducted publicly in Jordan.

## The Saudi Committee in Support of the Intifada Al Quds

504. Similarly, on or about October 16, 2000, the Saudi Committee in Support of the Intifada Al Quds (hereinafter referred to as "Saudi Committee") was established as a private charity registered with the Kingdom of Saudi Arabia.

505. According to the Saudi Committee, its purpose was to support the "Intifada Al Quds" and "all suffering families – the families of the martyrs and the injured Palestinians and the disabled."

506. The Saudi Committee also established a website to promote its activities.

507. The website has since been revamped and the committee's name has been sanitized on the English language version of the website.

508. However, even the sanitized Arabic version of the website continues to state that the committee's activities include: "**support of the families of martyrs and wounded**, as well as the handicapped, orphans and prisoners, as well as homeowners whose houses were destroyed and landowners whose land was bulldozed, as well as support of a number of

Palestinian social institutions and sponsorship of needy families ..."

509. In practice, the Saudi Committee constitutes a professional fundraising apparatus intended to subsidize the Intifada Al Quds, i.e., to subsidize the Palestinian terror campaign and to bankroll HAMAS and the PIJ and their related front organizations in the West Bank and Gaza. These goals are accomplished in two ways, both of which depend on the knowing participation and substantial assistance of the defendant Arab Bank.

510. The first goal is accomplished by providing a comprehensive insurance benefit of $5,316.06 for the families of Palestinian terrorists such as Izz Ad-Din Suhail Ahmad Al-Masri who murdered Judith Greenbaum, put JoAnne Nachenberg into a permanent vegetative state as well as "martyrs" like Hatem Yaqin Ayesh Al-Sheweikeh who murdered sixteen year old Shoshana Ben-Yishai and guaranteeing universal terrorist death and dismemberment insurance coverage to terrorists and their beneficiaries whenever a terrorist is killed.

511. Lesser benefits are also provided if the terrorist is injured either by Israeli security forces or captured as a result of his or her criminal conduct.

512. The Saudi Committee has provided millions of dollars as benefits to the families of the so-called "martyrs," i.e., the families of suicide bombers, and individuals killed by Israeli forces during the commission or attempted commission of terrorist acts, and to the families of Palestinians wounded during violent confrontations with Israel's security forces, as well those activists held in Israeli custody. This type of support is critical to HAMAS' efforts to win the hearts and minds of the Palestinian people and to create an infrastructure solidifying HAMAS's position within Palestinian society.

513. Moreover, the insurance benefit not only provides universal terrorist death and dismemberment insurance coverage for specific members of preferred terrorist organizations

such as HAMAS, but is intended as universal terrorist death and dismemberment insurance coverage available to terrorists belonging to any terrorist organization or to none at all, thereby incentivizing and rewarding all terrorists in Israel and eliminating the potential distinctions between terrorist groups, between individual (freelance) terrorists and the more established terrorist cells, and between the secular and radical Islamist terrorist organizations. Thus, the family of Shoshana Ben Yishai's murderer received payment notwithstanding his affiliation with PIJ. The family of Wafa Ali Khalil Idris was compensated for blowing up bystanders on a Jerusalem street, including four members of the Sokolow family from New York notwithstanding her being dispatched by the PLO.

514. Defendant Arab Bank administers the comprehensive terrorist death and dismemberment insurance scheme by receiving, transmitting and distributing the benefits in accordance with lists of families of "martyrs" and others eligible for "coverage."

515. Arab Bank actively participates in a formalized process which requires the families of so-called martyrs to obtain an official certification of their deceased relative's status as a bona fide martyr, replete with an individualized identification number.

516. Arab Bank, in turn, is provided relatively detailed lists consisting of the names of the martyrs, personal information and details concerning the date and manner of death and other information provided to it by the Saudi Committee and representatives of the leading terrorist groups via their charitable front organizations.

517. Arab Bank, in consultation with the Saudi Committee and local representatives of HAMAS, finalizes the lists, maintains a database of persons eligible under this universal terrorist death and dismemberment insurance plan, receives the funds for the plan, and opens a dollar account for each beneficiary. Every Palestinian family eligible under this universal

terrorist death and dismemberment insurance coverage plan is encouraged to collect the terrorism benefits through a local branch of the Arab Bank in the West Bank or Gaza.

518. If they choose to collect the insurance benefit, the families are required to present to the bank an "official" certification from the Palestinian Authority (replete with a unique identification number) establishing the bona fides of the martyr.

519. If the documentation proves satisfactory and the designated family member presents satisfactory photo identification, Arab Bank issues a receipt to the designated recipient of the martyrdom insurance benefit. For example, Dia A-Tawil perpetrated a suicide bombing attack on March 27, 2001 on behalf of HAMAS. He was designated Palestinian Authority Martyr No. 449. His father, Hussien Mohamed Farah Tawil, presented the "official" certification to the defendant Arab Bank, and received a confirmatory receipt stating that the benefit was paid to his Arab Bank account in Ramallah.

520. The conspiracy between Arab Bank, the Saudi Committee and HAMAS and others is ultimately designed to provide substantial material support to Palestinian terrorist organizations and to provide a meaningful incentive both to prospective recruits and to individuals contemplating the commission of independent acts of violence in the name of the "popular resistance." Arab Bank knew, and knows, that the purpose of the conspiracy and acts taken pursuant thereto is to encourage others to engage in terrorist activities, and to support the continued commission of terrorist activities.

521. Arab Bank was and is aware of the methods and means by which HAMAS, PIJ and other Foreign Terrorist Organizations seek to carry out their objectives.

522. In fact, Arab Bank's own support and commitment to the violent goals of its co-conspirators are embodied by the personal commitment of Arab Bank's founder, Abdul

82

Hamid Shoman and its present chairman, Abdul Majeed Shoman.

523. Thus on November 22, 2000, Arab businessmen, held a meeting with Yassir Arafat, at which time a new entity was formed, the Fund for Support of the Persistence of the Palestinian People to further bankroll the Palestinian Authority and the Second Intifada.

524. Defendant Arab Bank pledged $2,000,000.00.

525. Mr. Shoman pledged $500,000.00, personally.

526. The Shoman family's altruism towards the Second Intifada continued in June of 2001 when the Cultural Center of the Abdul Hamid Shoman Institute launched an exhibition on the subject of "the martyrs of the Palestinian Intifada" The stated purpose of the exhibit was to "honor to the martyrs of the blessed al-Aqsa intifada" by means of conveying the human and spirited image of their lives. The exhibit featured presentations of the martyrs' personal belongings that had been collected, such as clothing and "tools" they used, along with a introduction to their lives and deeds until the day of their 'martyrdom'.

527. Accordingly, the Bank's financial and ideological support for the Second Intifada is a matter of public record and its participation in diligently implementing the universal terrorist death and dismemberment insurance scheme is knowing and deliberate.

528. Defendant Arab Bank knowingly, willingly and substantially assists in the recruitment of terrorists.

529. Any person who chooses to participate in a suicide bombing or other terrorist attack does so secure in the knowledge that if he or she is killed in that attack, the financial needs of his or her family will be more than met for some time.

530. All of the families of all of the terrorists who killed or injured the plaintiffs in this action were eligible to receive the terrorist death and dismemberment insurance payments

outlined above and administered by Arab Bank.

531. This is equally true of the families of terrorists who were injured or apprehended.

532. In short, the Saudi Committee raises funds from private donors in Saudi Arabia and elsewhere in the Persian Gulf region and then allocates payments to defendant Arab Bank to fulfill its public pledge of universal insurance coverage to Palestinian terrorists.

533. The terrorist organizations, through their charitable fronts, collect data on their own operatives as well as all other terrorists killed, injured or in Israeli custody and transmit the information to the Saudi Committee and defendant Arab Bank.

534. Through the program administered by Arab Bank, the Saudi Committee paid and transmitted death benefits to at least approximately 200 fallen "martyrs" in the first year of its existence alone. As of November 2001, the Saudi Committee paid more than forty-two million dollars ($42,000,000) to terrorists and/or their beneficiaries. According to Arab Bank's Chief Banking Officer, Shukry Bishara, Arab Bank has transmitted $90,000,000.00 to Palestine on behalf of the Saudi Committee to "institutions and individuals alike."

535. In fact, Arab Bank serves as the exclusive administrator for the Saudi Committee's universal terrorist death and dismemberment insurance plan for Palestinian terrorists and their families.

536. Indeed, in its original website, the Saudi Committee openly declared that its funds were transmitted and distributed to the families of martyrs through local branches of the Arab Bank in Palestine. Although it has since been removed from the internet, the original archived webpage located at www.alquds-saudia.org\indexa.htm provided a list under the caption: "What has been done with your donations?"

537.  Item number ten (10) on the web page responds with the answer: "Opening a bank account for every entitled [Palestinian] through the Arab Bank in Palestine."

538.  The website further listed numerous "martyrs" whose cause of death was listed as "suicide attack."

539.  Similarly, in the annual report issued by the Saudi Committee and published in the Saudi newspaper *Al-Jazira* on February 11, 2001, the Saudi Committee identifies payments made to Palestinian prisoners as well as Palestinian "martyrs."  Notably, Table 4, Column 10 of the report helpfully identifies the cause of death for each martyr.

540.  For example, Musa Abd al-Qadir Ghanimat, the HAMAS operative who perpetrated a suicide attack at the Apropo restaurant in Tel Aviv is listed as an illustrative martyr.

541.  Accordingly, the terrorist death and dismemberment insurance plan includes the families of suicide bombers and the defendant Arab Bank and its senior management possess knowledge of this fact.

542.  Defendant Arab Bank provides a convenient means for transmitting and distributing this universal terrorist death and dismemberment insurance coverage plan across Palestinian controlled territories that would be far more difficult if attempted by other means such as courier.  Israeli territory separates Gaza from the West Bank and Israeli military checkpoints often separate one Palestinian city from another.

543.  Arab Bank makes it possible for the terrorist groups to transcend physical obstacles and to provide an organized and professional distribution system that literally underwrites the terror campaign.

544.  Arab Bank knows the criminal purpose that the accounts it opens and maintains for

85

the Saudi Committee are intended to serve.

545. The Saudi Committee and local HAMAS charitable front organizations have publicly and repeatedly advertised that purpose in both Saudi and Palestinian newspapers, on television and on the Saudi Committee's website, all of which are known to or should be known to Arab Bank and all of which are calculated to – and do – reach terrorists and potential terrorists. For instance:

- In the February 10, 2001 edition of the Saudi newspaper *Al-Jazirah*, the Saudi Committee published an annual report in which it listed the names of Palestinian prisoners to whom it provided terrorism benefits as well as the names of the Palestinian martyrs (including the names of those killed in suicide bombings) whose families received terrorism death benefits;

- In a November 23, 2001 edition of the Palestinian newspaper, *Al Quds*, the Saudi Committee placed an announcement listing the names of more than 1,000 individuals who had been injured during the Second Intifada or held in Israeli custody and invited them or their families "to go to the branches of the Arab Bank in their places of residence to receive their allocations donated by the Committee..."; and

- In a February 18, 2002 advertisement in the Palestinian newspaper *Al Hayyat Al Jedida*, a HAMAS charitable front organization in Ramallah announced that the Saudi Committee "requests that the families of the martyrs whose names are listed herein to go to a branch of the Arab Bank in their place of residence to receive the tenth payment offered by the Saudi Committee in the amount of $5,316.06 ...."

546. Since the Saudi Committee raises its funds in Saudi currency, which cannot conveniently be converted into Israeli currency (most commonly used in Palestinian controlled areas), those funds are primarily converted into U.S. dollars through the New York branch of Arab Bank and then routed to the local branches of Arab Bank in the West Bank. Arab Bank's role is material and essential to the furtherance of the criminal conspiracy in two (2) important respects.

547. First, Arab Bank provides both professionalism and transparency to the

process thereby reassuring wealthy Saudi and Gulf State donors that the money they are contributing will not be siphoned off by corrupt officials, but will in fact reach the families of terrorists as intended.

548. Second, Arab Bank, through its network of local branches in the West Bank and Gaza, provides an ideal distribution system that offers both convenience to the families of the terrorists who are able to bypass both the corruption of the Palestinian Authority and the uncertainty of cash payments delivered by courier and the certainty of an accounting system that minimizes the risk of duplicate payments and unreliable record-keeping.

549. By knowingly and actively participating in this process, Arab Bank and its co-conspirators, the Saudi Committee and others, have knowingly aided and abetted each and every terrorist act committed by Palestinian terrorists since the formation of the Saudi Committee's universal terrorism death and dismemberment insurance coverage scheme in October 2000 in violation of 18 U.S.C. § 2332, 18 U.S.C. § 2339A, 18 U.S.C. § 2339B and 18 U.S.C. § 2339C and common law torts of aiding and abetting, conspiracy and intentional infliction of emotional distress. Arab Bank has knowingly participated in the process for the purpose of supporting and providing financial assistance to terrorists, including, but not limited to HAMAS and other designated Foreign Terrorist Organizations, agents of HAMAS and other HAMAS controlled organizations, families of HAMAS operatives and the families of other terrorists.

## **Defendant Arab Bank Provides Material Support To Foreign Terrorist Organizations**
### **1. The Middle East**

550. Both HAMAS and the PIJ raise funds to support their terrorist acts through charitable front organizations which they control.

551. Arab Bank knowingly provides banking services to these charitable committees and affirmatively assists them in collecting, receiving, transmitting and distributing funds to support the Second Intifada terror campaign.

552. Arab Bank knowingly provides banking services to HAMAS directly through its Al-Mazra Branch Account # 3-810-622473-0330 in Beirut which collects funds directly in the name of HAMAS, and through charitable front organizations controlled by HAMAS which Arab Bank affirmatively assists in distributing funds to support the terror campaign.

553. The United States Department of Justice has, for example, identified the website: www.palestine-info.com as the "official" website of HAMAS[2]. The website itself solicits funds and asks contributors to send money to its Al-Mazra Branch Account # 3-810-622473-0330 at the Arab Bank in Beirut, but it also asks donors "to cite only the account number and not the name of the [Palestine Information] Center or any other names."

554. This request is necessary because Account # 3-810-622473-0330 is one of the few accounts that Arab Bank operates on behalf of HAMAS and which HAMAS controls and maintains directly.[3]

555. To assist it in carrying out its terrorist activities, HAMAS has established numerous front organizations, including, but not limited to:

        i. Al-Ansar Charity;

        ii. Ramallah Charitable Committee;

        iii. Tulkarem Charitable Committee;

        iv. the Islamic Association (Gaza) a/k/a Al Jamaya Al-Islamiya;

---

2 The website has since migrated to a new "URL" and can be found at www.palestine-info.info
3 According to the defendant, since the filing of the initial related case of *Linde v. Arab Bank Plc* in July of 2004, the bank has investigated this allegation and has since closed the account, frozen its funds and "reported it to the appropriate authorities."

    v.  Al Mujama Al-Islami;

    vi.  Nablus Charitable Committee;

    vii.  Jenin Charitable Committee;

    viii.  Islamic Charity Society of Hebron;

    ix.  Islamic Charitable Society Al-Bireh; and

    x.  Al Islah Charitable Society

556.    Arab Bank provides direct financial services to Al-Ansar Charity, Ramallah Charitable Committee, Tulkarem Charitable Committee, the Islamic Association (Gaza) a/k/a Al Jamaya Al-Islamiya, Nablus Charitable Committee, Al Mujama Al-Islami, Jenin Charitable Committee, Islamic Charitable Society Al-Bireh and Al Islah Charitable Society.

557.    The Tulkarem Charitable Committee, Nablus Charitable Committee, Ramallah Charitable Committee, Jenin Charitable Committee and Islamic Charity Society of Hebron have all been identified by United States Department of Justice as HAMAS front organizations and the management of each of these "charities" is in fact controlled by HAMAS operatives.

558.    The Tulkarem, Ramallah and Jenin Charitable Committees and Islamic Charity Society of Hebron were all designated as "Unlawful Organizations" by the government of Israel in February 2002 because of their connection to HAMAS.

559.    Arab Bank provides financial services to agents of HAMAS through the following accounts in the West Bank and Gaza Strip:

    (1)    Tulkarem Charity Committee a/k/a Lajna Zakat Tulkarem
             Account No. 9070-500010-6-510.
    (2)    Tulkarem Charity Committee
             Account No. 510/0/500010/970.
    (3)    Tulkarem Charity Committee (Jordanian Dinar)

Account No. 500/0/106500.

(4) Tulkarem Charity Committee (Euro Account)
Account No. 500010-6/596. See, Exhibit L.

(5) Charity Committee of Ramallah a/k/a  Ramallah Zakat
Committee. Account No.510/0/610686

(6) Charity Committee of Ramallah
Account No. 510/0/610686-9030

(7) Charity Committee of Ramallah
Account No. 510/2/610686

(8) Nablus Zakat Committee
Account No. 500/0/400336-0193

(9) Islamic Charitable Society Al-Bireh
Account No. 510/7/602835

(10) Al-Mujama al-Islami
6-5/500

(11) Al-Mujama al-Islami
6-0/510

(12) Islamic Charity Society of Hebron
Account No. 510/0/9040-750049

(13) Islamic Charity Society of Hebron
Account No. 510/2/9030- 610686

560. The PIJ has established numerous front organizations, including:

i. Al-Ihsan Charitable Society;

ii. Dar al-Huda Society and

iii. Islamic An-Naqqa Society for Women, Bethlehem.

561. Arab Bank provides direct financial services to Al-Ihsan Charitable Society and knowingly maintains accounts for Dar al-Huda Society in US Dollars, Israeli Shekel and Jordanian Dinar.

562. Arab Bank has also provided financial services to the PLO's al-Aqsa Martyrs Brigades. For example, Munir al-Maqdah, also known as Abu Hasan, transferred between $40,000 and $50,000 for weapons, expenses, and bomb-making materials to the Arab Bank account of Nasser Aweis, a senior Fatah operative and instructed him to report back by telephone on the success of his attacks, such as the January 17, 2002 assault on the Hadera

banquet hall that resulted in the death of plaintiff Aharon Ben-Yisrael Ellis. Arab Bank is

generally aware that it provides financial services to the PLO's al-Aqsa Martyrs Brigades and

its operatives as well as other PLO controlled terrorist cells.

563. The terrorist affiliations of the various charitable front organizations is hardly

clandestine nor are there activities unknown to the management of Arab Bank. For example,

the HAMAS charitable front, Al-Ansar Charity maintains a website proclaiming that:

> Al-Ansar Society opens its doors to the families of the martyrs who intend
> to register their dead who, with their splendid blood, saturated pure
> Palestine and drew the lines of liberty and the coming dawn. The Al-
> Ansar Society is following in their footsteps and shares in the sorrow and
> the hopes of the families of the martyrs and their relatives.

564. The website further boasts that it has given money to Palestinians whom were

wounded, incarcerated or killed during the Second Intifada, including $6,000.00 to the family

of Iz Aldin (also spelled: "Azzadin") Al Masri, the suicide bomber who massacred 15 people,

including 7 children. Al Masri also murdered and maimed several Americans including Judith

Greenbaum and JoAnne Nachenberg at the Sbarro pizzeria in downtown Jerusalem on August

9, 2001.

565. The website of Al-Ansar helpfully explains that:

> The Director General of the Al-Ansar Charitable Society and
> the person in charge of the portfolio for the care of the
> martyrs at the Society's website said that the Society has
> furnished the management of the Arab Bank with lists of
> names of the martyrs and the families of the entitled
> beneficiaries, in order to pay the monies to which the martyrs
> are entitled.

566. Al-Ansar maintains an account with the Arab Bank in Gaza.

### 2. Europe

567. Arab Bank provides financial services to agents of HAMAS by maintaining bank

accounts for the following **designated Foreign Terrorist Organizations affiliated with HAMAS**:

(1) The Association de Secours Palestinien (ASP) –Arab Bank, Zurich

(2) Commite de Bienfaisance et de Secours aux Palestiniens (CBSP) – Arab Bank, Paris

(3) Palestinian Association in Austria – Arab Bank, Paris

### 3. New York

568. Defendant Arab Bank has also knowingly laundered funds for the Holy Land Foundation For Relief and Development ("HLF"), a Texas based "charity" which has raised funds in the United States for HAMAS for more than a decade. Arab Bank, in turn, channeled tens of thousands of dollars for HLF through its New York branch to the Ramallah Charitable Committee, the Tulkarem Charity Committee and the Charitable Society of Hebron, all agents of HAMAS.

569. On March 15, 1996, a feature article in The New York Times detailed the financing of HAMAS by so-called charitable organizations. The article specifically discussed Israeli government claims that HLF was a "key fundraising operation" for HAMAS.

570. On May 6, 1997, the government of Israel designated HLF as a HAMAS front organization and declared that HLF "deals in the practice of transferring monies to families of HAMAS activists, who carried out deadly attacks ...."

571. Arab Bank nonetheless claims to have a "highly professional relationship" with Israeli authorities.

572. On September 25, 1997, the Palestinian Authority closed what it identified as 16 HAMAS institutions and associations. HLF's Gaza office was one of the entities

(temporarily) closed by the Palestinian Authority. The closure, including identification of HLF as a targeted HAMAS entity, was detailed in a <u>Jerusalem Post</u> news account on September 28, 1997.

573. HLF and its officers have been criminally indicted in the United States District Court for the Northern District of Texas for providing material support to a designated Foreign Terrorist Organization (HAMAS) – including for specific transactions involving payments made by HLF to the Ramallah Charitable Committee, Tulkarem Charitable Committee, and the Islamic Charity Society of Hebron.

574. The indictment specifies particular financial transactions initiated by HLF which resulted in monetary transfers to the Ramallah Charitable Committee, Tulkarem Charitable Committee, and the Islamic Charity Society of Hebron which violate 18 U.S.C. §2339B.

575. On January 10, 2001 a federal district court in Illinois rendered a decision declining to grant a motion to dismiss in a case initiated by the parents of David Boim, who was killed by a HAMAS terrorist in 1997. The Boims had sued, among others, HLF, for providing material support to HAMAS, a designated Foreign Terrorist Organization.

576. Nonetheless, Arab Bank continued to deposit HLF fund transfers and credit the Arab Bank account of the Ramallah charitable front <u>even after</u> the <i>Boim</i> case placed the defendant on further notice of HLF's criminal activities.

577. Similarly, the New York branch of the Arab Bank has facilitated the transfer of significant sums to the Tulkarem Charitable Committee and other agents of HAMAS despite the fact that in some cases both the "donor" of the funds as well as the recipient had been previously formally designated as "Unlawful Organizations" by the government of Israel.[4]

---

[4] One of the signatories on the Tulkarem Charitable Committee account is Ammar Tawfiq Ahmad Badawi, a prominent member of the Muslim Scholars Association who was a signatory on the infamous <i>Fatwa</i> – or Islamic

578.    Moreover, following the Israeli army's military operations in the spring of 2002, the government of Israel obtained and subsequently disclosed extensive materials (most of them available on the internet) demonstrating the Tulkarem Charitable Committee's connections to HAMAS and the Islamist movement.

579.    Nonetheless, Arab Bank and its New York branch continue to convert substantial sums of money and forward tens of thousands of dollars from New York to the Tulkarem account of the Tulkarem Charitable Committee at the Arab Bank and to other known HAMAS fronts.

## Cultivation of the Culture of Death

580.    The charitable front organizations play a central role in financing the terror campaign by providing the means of raising funds to maintain the institutions that serve as recruiting grounds for terrorist organizations.

581.    As set forth in an internal HAMAS memorandum recently captured by the Israeli army during a raid of the offices of the Hebron Charitable Committee, HAMAS has arranged for the "transfer [of] large sums" to the charitable committee and other HAMAS front organizations through the "charity activities" of their operatives abroad.

582.    The memorandum emphasizes that HAMAS "require[s] new bank account numbers for money transfers" and promises that the HAMAS will:

> invest efforts to transfer money for the martyrs (the shahids) and prisoners, via the transfer [to] charitable institutions. This is a primary goal in the framework of the effort to transfer aid money to these institutions, so that these budgets are released in the best manner and in order to bring about an improvement in

religious ruling – declaring that suicide bombings are permitted by Islamic law. Mr. Badawi is a leading figure in HAMAS.

the level of the movement's performance.

583. The memorandum concludes with the promise that HAMAS will continue to "build up the activities and operations" of its front organizations by, among other things, *"taking advantage of the conditions and the atmosphere of death."*

584. The financial support provided by the Saudi Committee via the Arab Bank as well as the accounts maintained by the terror organizations' charitable fronts constitutes the backbone of the donor base and operational budgets of HAMAS and the PIJ, and has allowed them to expand their operations, attract more recruits, and professionalize their financial distribution channels.

585. Each of these front organizations officially holds itself out to the public as a charitable organization with a purely humanitarian and benign purpose. In fact, however, the primary mission of these organizations is to raise and launder funds for terrorist organizations and otherwise to coordinate and conduct activities that are essential to the conduct of terrorist operations and to the material support of terrorist operations.

586. Funds raised by the charitable front organizations are fungible and are allocated in part to terrorist activities or used to free up other funds that are then allocated for terrorist activities.

587. In addition to the Saudi Committee's universal terrorist death and dismemberment insurance coverage plan, contributions from individual and corporate sponsors abroad are primarily made to the charitable front organizations. The front organizations make those contributions available to HAMAS and the PIJ in accordance with the instruction of their leaders. These organizations then disburse a percentage of the funds they receive from their front organizations to purchase weapons and explosive materials, to recruit and train

operatives and otherwise to plan and carry out terrorist attacks.

588. By knowingly providing banking and administrative services to charitable front organizations that are controlled and directed by designated Foreign Terrorist Organizations, including collecting, transferring and laundering funds for those organizations through its New York branch, Arab Bank has substantially assisted HAMAS and the PIJ in the furtherance of a murderous conspiracy to commit multiple acts of international terrorism as defined by 18 U.S.C. §§ 2331 and 2332 and has committed numerous overt acts in furtherance of the conspiracy.

589. Indeed, had the doors of Arab Bank not been opened to HAMAS or the PIJ during the past fourf years, the leaders of these terrorist organizations would have had to make far more onerous arrangements for transfer of foreign contributions to terrorists within Palestinian-controlled territory and the great bulk of those funds would likely have never reached their destination.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

### AIDING AND ABETTING THE MURDER, ATTEMPTED MURDER AND SERIOUS BODILY INJURIES TO UNITED STATES CITIZENS IN VIOLATION OF 18 U.S.C. § 2332(a); 18 U.S.C. § 2332(b); 18 U.S.C. § 2332(c) AND 18 U.S.C. § 2333(a)

590. Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

591. Each of the plaintiffs has been injured in his person, property or business by reason of acts committed by Palestinian terrorists that involve violence or are dangerous to human life and that violate the criminal laws of the United States, including the prohibition on killing, attempting to kill, causing serious bodily injury or attempting to cause serious bodily

injury to U.S. citizens as set forth in 18 U.S.C. § 2332.

592.    The acts of the Palestinian terrorists in killing, and attempting to kill U.S. nationals and other persons were and are intended (a) to intimidate or coerce the civilian population of Israel, (b) to influence the policy of the government of Israel by intimidation or coercion, and (c) to affect the conduct of the government of Israel by mass destruction and murder.

593.    The acts of terrorism set forth herein are extreme and outrageous and were committed with the knowledge of and intention to cause extreme physical pain and suffering to any and all persons within close proximity of the attack and extreme emotional distress to the family members of those who were killed or injured by reason of those acts.

594.    The extraordinary financial and administrative services that Arab Bank has provided to the terrorists and their families, and to HAMAS, the PIJ and AAMB, including administering universal terrorist death and dismemberment insurance coverage to the families of suicide bombers and other terrorists, provides substantial assistance to HAMAS, the PIJ and AAMB and others in recruiting and incentivizing suicide bombers and other terrorists and because money is fungible, in freeing up funds for use in military operations and the commission of violent acts resulting in death and injury, thereby preparing and facilitating acts of terrorism in violation of 18 U.S.C. § 2332 that have caused injuries to the plaintiffs.

595.    The defendant Arab Bank knows that it is providing material support for acts of international terrorism, as is evidenced by its close contact with the Saudi Committee and its coordination of the payment schedules and lists of martyrs, and the repeated public advertisement of the activities of the Saudi Committee in various Palestinian newspapers as set forth above.

596. As set forth more fully above, but for the assistance provided by the Arab Bank, the funding of the universal terrorist death and dismemberment insurance coverage plan for terrorists and the families of terrorists would have been substantially more difficult to implement.

597. Throughout the period in which it has provided these extraordinary financial and administrative services to HAMAS, the PIJ, AAMB and to individual terrorists and their families, the Arab Bank knew that the charitable front organizations of the terrorist organizations have played a major role in raising funds for HAMAS and the PIJ, which have committed numerous criminal acts including suicide bombings intended to intimidate and coerce the civilian population of Israel and to influence the policy of the Israeli Government.

598. Throughout the period in which it has been involved in activities assisting the PIJ, HAMAS and AAMB and individual terrorists and their families, Arab Bank knew that those activities have substantially assisted and encouraged dangerous and criminal acts set forth herein.

599. By aiding and abetting violations of 18 U.S.C. § 2332 that have caused each of the plaintiffs to be injured in his or her person, property, or business, Arab Bank is jointly and severally liable pursuant to 18 U.S.C. § 2333(a) for any and all damages that plaintiffs have sustained as a result of such injuries.

## SECOND CLAIM FOR RELIEF

## CONSPIRACY TO COMMIT MURDER AND ATTEMPTED MURDER OF UNITED STATES CITIZENS IN VIOLATION OF 18 U.S.C. §§ 2332(b) and 2333(a)

600. Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

601. Each of the plaintiffs has been injured in his person, property or business by reason of acts committed by Palestinian terrorists that involved murder or attempted murder in violation of the criminal laws of the United States, including the prohibition on killing or attempting to kill U.S. citizens as set forth in 18 U.S.C. § 2332.

602. The acts of the Palestinian terrorists in killing or attempting to kill U.S. citizens and other persons were intended (a) to intimidate or coerce the civilian population of Israel, (b) to influence the policy of the government of Israel by intimidation or coercion, and (c) to affect the conduct of the government of Israel by mass destruction and murder.

603. The acts of terrorism set forth herein are extreme and outrageous and were committed with the knowledge of, and intention to, cause extreme physical pain and suffering to any and all persons within the close proximity of the attack and extreme emotional distress to the family members of those who were injured or killed by reason of those acts.

604. Arab Bank agreed to combine with other persons to act unlawfully, in the manner set forth in this complaint and committed overt acts in furtherance of the conspiracy. At all relevant times, Arab Bank knew of the conspiracy and knew and knows, in particular, of the roles of the charitable front organizations and their leaders in furtherance of that conspiracy. Arab Bank knowingly and purposefully agreed to perform extraordinary banking and administrative services for the Saudi Committee, HAMAS, the PIJ and AAMB with the knowledge, and for the purpose, that such services facilitate the activities of its leaders and

support terrorist activities pursuant to a common scheme to encourage and incentivize acts of terrorism. Arab Bank's actions, in fact, facilitated the conspiratorial scheme because, as set forth more fully above, but for the actions of the Arab Bank, the funding of the universal terrorist death and dismemberment insurance coverage for terrorists and their families would have been substantially more difficult to implement.

605. By conspiring to act with the Saudi Committee, HAMAS the PIJ and AAMB, and their respective charitable front enterprises to support, encourage and facilitate violations of 18 U.S.C. § 2332 that have injured each plaintiff's respective person, property, or business, Arab Bank is jointly and severally liable pursuant to 18 U.S.C. § 2333(a) for any and all damages that plaintiffs have sustained as a result of such injuries.

### THIRD CLAIM FOR RELIEF

### PROVISION OF MATERIAL SUPPORT TO TERRORISTS IN VIOLATION OF 18 U.S.C. § 2339A AND 18 U.S.C. § 2333(a)

606. Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

607. The extraordinary financial and administrative services that Arab Bank has knowingly provided to the terrorists, their families, and HAMAS, the PIJ and AAMB, including serving as the exclusive administrator of universal terrorist death and dismemberment insurance coverage plan to the families of suicide bombers and other terrorists, provides material support to the preparation and carrying out of numerous acts of international terrorism which have caused direct injury to the plaintiffs.

608. As set forth more fully above, but for the assistance provided by the Arab Bank, the funding of the universal terrorist death and dismemberment insurance plan for terrorists and

the families of terrorists would have been substantially more difficult to implement.

609.    By participating in the commission of violations of 18 U.S.C. § 2339A that have caused each of the plaintiffs to be injured in his or her person, business or property, defendant Arab Bank is jointly and severally liable pursuant to 18 U.S.C. § 2333(a) for any and all damages that plaintiffs have sustained as a result of such injuries.

### FOURTH CLAIM FOR RELIEF

### COMMITTING ACTS OF INTERNATIONAL TERRORISM
### IN VIOLATION OF 18 U.S.C. § 2339B(a)(1) AND 18 U.S.C. § 2333(a)

610.    Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

611.    By knowingly transferring funds from and to agents of HAMAS, including the Holy Land Foundation, maintaining accounts for and collecting, receiving and transmitting funds for designated Foreign Terrorist Organizations affiliated with HAMAS such as the Association de Secours Palestinien (ASP);  the Commite de Bienfaisance et de Secours aux Palestiniens (CBSP); and the Palestinian Association in Austria; by maintaining accounts for and collecting, receiving and transmitting funds for known agents of HAMAS such as the Tulkarem Charitable Committee and the Ramallah Charitable Committee, defendant Arab Bank and its New York branch office have provided material support to designated Foreign Terrorist Organizations under the Anti-Terrorism and Effective Death Penalty Act of 1996 in violation of 18 U.S.C. §§ 2339B(a)(1).

612.    As set forth more fully above, but for the assistance provided by the Arab Bank, the funding of the universal terrorist death and dismemberment insurance plan for terrorists and the families of terrorists would have been substantially more difficult to implement.

613.   Based on the defendant's level of sophistication and presence as a federally regulated financial institution in the United States, defendant Arab Bank not only knew of the unlawful activities of HAMAS but also knew or recklessly disregarded its actual designation as a Foreign Terrorist Organization and the designation of Association de Secours Palestinien (ASP);  the Commite de Bienfaisance et de Secours aux Palestiniens (CBSP); and the Palestinian Association in Austria as a Foreign Terrorist Organizations.

614.   By maintaining accounts for and collecting, receiving and transmitting funds for known agents of PIJ such as the Al-Ihsan Charitable Society and the Dar al-Huda Society, defendant Arab Bank  has provided material support to a designated Foreign Terrorist Organizations under the Anti-Terrorism and Effective Death Penalty Act of 1996 in violation of 18 U.S.C. §§ 2339B(a)(1).

615.   By providing material support to a designated Foreign Terrorist Organizations, Arab Bank is therefore civilly liable for damages to all plaintiffs killed or injured by HAMAS and PIJ pursuant to 18 U.S.C. § 2333(a).

## FIFTH CLAIM FOR RELIEF

### COMMITTING ACTS OF INTERNATIONAL TERRORISM IN VIOLATION OF 18 U.S.C. § 2339B(a)(2) AND 18 U.S.C. § 2333(a)

616.   Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

617.   By knowingly transferring funds from and to agents of HAMAS, including  the Holy Land Foundation, the Tulkarem Charitable Committee and the Ramallah Charitable Committee, defendant Arab Bank's New York branch office has provided material support to a designated Foreign Terrorist Organization under the Anti-Terrorism and Effective Death

Penalty Act of 1996 in violation of 18 U.S.C. § 2339B(a)(2).

618. Based on the defendant's level of sophistication and presence as a federally regulated financial institution in the United States, defendant Arab Bank not only knew of the unlawful activities of HAMAS but also knew or recklessly disregarded its actual designation as a Foreign Terrorist Organization. The defendant also knew or recklessly disregarded information that would have caused it to know that HLF and the Tulkarem Charitable Committee were agents of HAMAS.

619. As a federally regulated financial institution in the United States, defendant Arab Bank had and legal obligation to retain possession of, or maintain control over, all funds belonging to or destined to be transferred to agents of HAMAS and to report to the Secretary the existence of such funds in accordance with regulations issued by the Secretary. By failing to do so, Arab Bank has violated 18 U.S.C. § 2339B(a)(2) and has proximately caused injury to, and is therefore civilly liable for damages to all plaintiffs killed or injured by HAMAS pursuant to 18 U.S.C. § 2333(a).

### SIXTH CLAIM FOR RELIEF

### FINANCING OF TERRORISM IN VIOLATION OF 18 U.S.C. § 2339C and 18 U.S.C. § 2333(a)

620. Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

621. The financial services that Arab Bank has willfully and unlawfully provided to HAMAS, the PIJ, AAMB and the Saudi Committee include the giving, raising, collecting and transmitting of funds with the knowledge that such funds have been and will be used, in part, to facilitate acts intended to cause death or serious bodily injury to civilians such as the victims of the terrorist acts described in this complaint, who were not taking part in any armed

conflict.

622. As set forth more fully above, but for the assistance provided by the Arab Bank, the funding of the universal terrorist death and dismemberment insurance coverage plan for terrorists and the families of terrorists would have been substantially more difficult to implement.

623. By willfully violating 18 U.S.C. § 2339C, Arab Bank is therefore jointly and severally liable to the plaintiffs who have suffered injuries to their business, person or property by reason of such acts under 18 U.S.C. § 2333(a).

## SEVENTH CLAIM FOR RELIEF
## COMMITTING ACTS OF INTERNATIONAL TERRORISM
## IN VIOLATION OF 18. U.S.C. § 2333(a)

624. Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

625. Defendant Arab Bank's acts of providing banking and other services, including the provision of death benefits, to HAMAS, the PIJ, the AAMB and other international terrorists, were "a criminal violation if committed within the jurisdiction of the United States or of any State" and "appear to be intended to intimidate or coerce a civilian population . . . to influence the policy of a government by intimidation or coercion or to affect the conduct of a government by mass destruction" within the meaning of 18 U.S.C. § 2331.

626. The extraordinary financial and administrative services that Arab Bank has provided to the terrorists, their families, and HAMAS, the PIJ and AAMB including administering universal coverage insurance to the families of suicide bombers and other terrorists, provides substantial assistance to HAMAS, the PIJ, AAMB and others in recruiting and incentivizing suicide bombers and other terrorists and thereby preparing and facilitating

acts of international terrorism in violation of 18 U.S.C. § 2333(a) that have caused injuries to the plaintiffs.

627.  Arab Bank's acts were dangerous to human life, by their nature and as evidenced by their consequences.

628.  Arab Bank's acts either occurred primarily outside the territorial jurisdiction of the United States or transcended national boundaries in terms of the means by which they were accomplished.

629.  Accordingly, Arab Banks' acts constitute acts of international terrorism as defined by 18 U.S.C. §§ 2331 and 2333(a).

630.  Arab Bank knowingly provided substantial assistance to acts of international terrorism and accordingly, its acts constitute aiding and abetting acts of international terrorism.

631.  Arab Bank also agreed to combine with other persons to act unlawfully in the manner set forth above and committed overt acts in furtherance of the conspiracy.  At all relevant times, Arab Bank knew of the conspiracy and knew, and knows, in particular, of the roles of the charitable front organizations and their leaders in furtherance of that conspiracy. As set forth more fully above, but for the assistance provided by the Arab Bank, the funding of the universal coverage death and dismemberment benefits plan for terrorists and the families of terrorists would have been substantially more difficult to implement.

632.  The acts of terrorism set forth herein are extreme and outrageous and were committed with the knowledge of and intention to cause extreme physical pain and suffering to any and all persons within close proximity of the attack and extreme emotional distress to the family members of those who were killed or injured by reason of those acts.

disregard for the consequences of such actions.

638. As set forth more fully above, but for the assistance provided by the Arab Bank, the funding of the universal terrorist death and dismemberment insurance coverage plan for terrorists and the families of terrorists would have been substantially more difficult to implement.

639. Arab Bank's conduct was unreasonable and outrageous and exceeds the bounds usually tolerated by decent society, and was done willfully, maliciously and deliberately, or with reckless indifference, to cause Plaintiff severe mental and emotional pain, distress, and anguish and loss of enjoyment of life.

640. As a direct, foreseeable and proximate result of the conduct of Defendant Arab Bank as alleged hereinabove, plaintiffs have suffered non-pecuniary damages in amounts to be proven at trial.

641. Arab Bank's actions were undertaken willfully, wantonly, maliciously and in reckless disregard for Plaintiff's rights, and as a direct, foreseeable and proximate result thereof plaintiffs suffered economic and emotional damage in a total amount to be proven at trial, therefore plaintiffs seeks punitive damages in an amount sufficient to deter Arab Bank and others from similar future wrongful conduct.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray that this Court:

      (a)      Accept jurisdiction over this action;

      (b)      Enter judgment against Arab Bank and in favor of each plaintiff for compensatory damages in amounts not less than those set forth herein and additional sums in amounts to be determined at trial;

(c)    Enter judgment against Arab Bank and in favor of each plaintiff for treble damages pursuant to 18 U.S.C. § 2333(a);

(d)    Enter judgment against Arab Bank and in favor of each plaintiff for any and all costs sustained in connection with the prosecution of this action, including attorneys' fees, pursuant to 18 U.S.C. § 2333(a);

(e)    Order such preliminary and permanent injunctive relief as may be necessary and appropriate to prevent Arab Bank from continuing to engage in the unlawful practices set forth herein, including but not limited to:

> (i)    Freezing certain identified accounts maintained by Arab Bank that are owned and/or controlled by HAMAS, other Foreign Terrorist Organizations or their agents for use by HAMAS or other designated Foreign Terrorist Organizations;

> (ii)    Freezing the accounts of, and barring the execution of any further transactions for, on behalf of, or for the benefit of entities that have provided funds to HAMAS or other Foreign Terrorist Organizations or their agents; and

> (iii)    Compelling Arab Bank to fulfill the various statutory reporting requirements with respect to all funds in its possession, custody or control ". . . in which a [Foreign Terrorist Organization], or its agent, has an interest." 18 U.S.C. § 2339B(a)(2).

(f)    Enter an Order declaring that Arab Bank has violated, and is continuing to violate, the Anti-Terrorism Act, 18 U.S.C. § 2331 et seq.; and

(g)    Grant such other and further relief as justice requires.

PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.

Dated: January 21, 2005
       Oradell, New Jersey

                                    OSEN & ASSOCIATE, LLC

                              By _____

                                    Gary M. Osen (GO-5790)
                                    Peter Raven-Hansen, Of Counsel
                                    700 Kinderkamack Road
                                    Oradell, New Jersey 07649
                                    (201) 265-6400

                                    Attorneys for Plaintiffs

WECHSLER HARWOOD LLP
Andrew D. Friedman
488 Madison Avenue
New York, New York 10022
(212) 935-7400

KOHN, SWIFT & GRAF, P.C.
Robert Swift
Steven Steingard
One South Broad Street
Philadelphia, PA 19107
(215) 238-1700

MCINTYRE, TATE, LYNCH & HOLT, LLC
David J. Strachman, Esq.
321 South Main Street, Suite 400
Providence, Rhode Island 02903
(401) 351-7700

NITSANA DARSHAN-LEITNER & ASSOCIATES
Nitsana Darshan-Leitner, Esq.
11 Havatikim Street
Petah Tikva, 49389 Israel